731 So.2d 240 (1999)
Houston R. WILLIAMS, et al.
v.
CITY OF BATON ROUGE, Parish of East Baton Rouge, et al.
John Raby, et al.
v.
City of Baton Rouge, Parish of East Baton Rouge, et al.
Nos. 98-C-1981, 98-C-2024.
Supreme Court of Louisiana.
April 13, 1999.
Rehearing Denied May 14, 1999.
*243 William S. McKenzie, Taylor, Porter, Brooks & Phillips, Baton Rouge; James J. Zito, Michael E. Ponder, Baton Rouge, Counsel for Applicant No. 98-C-1981.
Paula Cobb, Baton Rouge; Edwin A. Smith, III, Smith, Smith & Smith, Baton Rouge; Harry L. Shoemaker, III, Shoemaker, Lazarre & Daspit, Baton Rouge; Gracella G. Simmons, Lake Charles, John D. Ziober, James E. Moore, Jr., Baton Rouge, Counsel for Respondent No. 98-C-1981.
John D. Ziober, James E. Moore, Jr., Baton Rouge, Counsel for Applicant No. 98-C-2024.
William S. McKenzie, Taylor, Porter, Brooks & Phillips, Baton Rouge; James J. Zito, Michael E. Ponder, Paula Cobb, Baton Rouge; Edwin A. Smith, III, Smith, Smith & Smith, Baton Rouge; Harry L. Shoemaker, III, Shoemaker, Lazarre & Daspit, Baton Rouge; Gracella G. Simmons, Lake Charles, for Respondent No. 98-C-2024.
VICTORY, J.[*]
We granted these writs to determine the extent to which the City of Baton Rouge/Parish of East Baton Rouge (the "City/Parish") is liable for digging three drainage ditches on plaintiffs' property without their consent and to determine whether the City/Parish's liability for damages is covered under its excess insurance policy which contains an intentional act exclusion. After reviewing the record and the applicable law, we find that the City/Parish committed a trespass onto plaintiffs' land and is liable for damages, albeit in a lesser amount than the lower courts awarded, and that the City/Parish committed an "intentional act" and thus its excess insurance carrier is not liable.

FACTS AND PROCEDURAL HISTORY
The Gage, Raby, and Williams families own three adjoining tracts of land on Staring Lane in Baton Rouge. The Gage and Williams properties have a few houses on them and the Raby property has a small motel on it, but otherwise, the property is primarily undeveloped. On April 27, 1954, *244 Thomas and Levy Gage granted a 300 foot lateral drainage servitude to the Department of Highways of the State of Louisiana, running from a culvert box on Staring Lane through the Gage's property. Although the State was entitled to excavate a 300 foot long ditch, it only excavated a 58 foot ditch. From there, the ditch tied into a natural drain that ran diagonally across the Gage, Raby and Williams property and into Bluebonnet Swamp. Another culvert box was located in front of the Williams property, but the State did not have a servitude on the Williams property.
On May 26, 1983, the City/Parish filed a Petition for Injunction against members of the Williams, Gage and Raby families alleging that they were allowing refuse material to be dumped in the natural drain which was causing extensive flooding in the area. Only John Raby was served and appeared at a hearing on July 9, 1983. At the hearing, the judge orally ruled as follows:
This Court is satisfied by the evidence presented today that there did exist for many years a natural drain across Mr. Raby's property, approximately six to eight hundred feet from Staring Lane, that this drain fed into another natural drain that then carried water back into a low area and then, eventually, into Bayou Fountain. It may well be true that by the improvement of Staring Lane and the securing of the right of way on the adjoining property to build a ditch to carry water from Staring Lane back to the existing natural drain increased the flow of water. However, this Court is satisfied from the evidence presented that Mr. Raby has filled in the natural drain that existed some six hundred to eight hundred feet back from Staring Lane on his own property and has participated in the filling up of the ditch leading from Staring Lane back towards the natural drain.
The judge then issued an injunction prohibiting Mr. Raby from any further dumping into the "natural drain across his property and of the ditch adjoining the property." The judge refused to issue an order allowing the City/Parish to go onto the property and restore the natural drain and instead instructed the parties to come to an agreement to solve the drainage problem. On July 28, 1983, an Assistant Parish Attorney for the City/Parish issued a legal opinion to the Assistant Director of Public Works advising him that the law would allow the Department of Public Works to go to court and request a court order to allow the DPW to go onto private property and clean natural drains which would affect associated public drainage facilities. The Assistant Parish Attorney further advised him that "normally when dealing with private property, drainage problems should be resolved by and between the individual property owners. The Municipality should get involved only when some public drainage facility is effected [sic]."
The City/Parish subsequently filed a Rule for Contempt and for Injunctive Relief claiming the dumping continued and asking that it be allowed to restore the 300 foot servitude and the natural drain which ran across all three properties. The rule was set for November 18, 1983 but was continued and never reset.
Heavy rains fell in late December of 1983 and water pooled on Staring Lane around the area of the culvert. The City/Parish maintains they had to place barricades on Staring Lane because the water was hazardous to traffic. The City/Parish also maintains that the standing water was threatening the stability of the road bed and that the subdivision across the street was in danger of flooding. Accordingly, on the morning of January 6, 1984, the City of Baton Rouge and the Parish of East Baton Rouge sent employees of the Department of Public Words (DPW), accompanied by police officers, onto the plaintiffs' property with heavy construction equipment to try and solve the drainage problem. John Raby objected to their presence and demanded that he *245 be served with a court order by the police officer. After examining the papers supplied by DPW employee Emmett Braud, Officer Michael Shavers determined that the DPW did not have the proper authority to enter the plaintiffs' property. Officer Shavers telephoned the police department's legal advisor who advised him that the papers did not authorize DPW's entry onto plaintiffs property. They then contacted Baton Rouge Mayor Pat Screen and Officer Shavers told him that the department's legal advisor had advised him that the DPW papers did not authorize entry onto plaintiffs' property. Mayor Screen nevertheless directly ordered Officer Shavers to continue with the operations. Officer Shavers resisted, telling the mayor that he would check with his supervisor. His supervisor ordered him to go out to the property and assist the DPW. When Officer Shaves continued to resist, his supervisor told him that he had spoken with the chief of police, who had also spoken with the mayor, and gave Officer Shavers a "direct order" to assist the DPW. Officer Shavers then returned to plaintiffs' property, along with the DPW workers.
At approximately 11:00 a.m. that morning, DPW workers began the excavation process. They remained on the property for between one and two months during which time they dug three canals: one through the front of all three properties, one through the back of all three parcels, and the third along the property line of the Williams property. The canals were cut approximately ten to fifteen feet deep and twenty to thirty feet across, severing each property into three distinct pieces. During this time, Baton Rouge police officers sat in an unmarked car on Staring Lane from 8:00 a.m. to 4:00 p.m. and private security guards hired by the City/Parish performed the security duties from 4:00 p.m. to 8:00 a.m.
The Williams, Gage and Raby families filed two separate suits, which were later consolidated, against the City/Parish, DPW, Mayor Pat Screen, police officers Michael Shavers, Rickey Eiermann and Major Satterwhite of the Baton Rouge Police Department, DPW Director William Addison, DPW Assistant Director Robert Atkinson and DPW Emmett Braud, Fidelity & Casualty Insurance Company (F & C) and Chicago Fire Insurance Company (Chicago). After a five-day bench trial, the trial judge concluded that the City/Parish and Mayor Pat Screen and DPW Director Addison, in both their individual and official capacities, were liable and awarded damages for damage to property and mental anguish totaling over $1,000,000. The court further held that F & C and Chicago were not liable. On motion for new trial, the trial court reversed in part its earlier judgment and held that Mayor Screen and Director Addison were not liable in their individual capacities and that the F & C and Chicago policies provided coverage to the City/Parish.
On appeal, the First Circuit made several adjustments to the property damage awards, but otherwise, affirmed the ruling of the trial court, holding that the City/Parish committed a trespass on plaintiffs' property for which damages, including mental anguish damages, were recoverable, and that these damages were covered by the City/Parish's liability and excess insurance policies furnished by F & C and Chicago, respectively. Williams v. City of Baton Rouge, 96-0675, 96-0676 (La.App. 1 Cir. 4/30/98), 715 So.2d 15. We granted writs filed by the City/Parish and Chicago. Williams v. City of Baton Rouge, 98-1981, 98-2024 (La.11/25/98), 729 So.2d 579.

DISCUSSION

Trespass or Inverse Condemnation
The City/Parish claims that the lower courts erred in characterizing the City/Parish's action as a trespass, rather than an inverse condemnation, which resulted in the plaintiffs' recovery of damages under La. C.C. 2315. The City/Parish *246 argues that it was justified in going onto plaintiffs' property to dig the ditches because an emergency flooding situation existed on Staring Lane which threatened the subdivision across the street from plaintiffs' property and the road bed and that the judge in the July, 1983 injunction suit had ruled that a natural drain existed on the Raby's property and gave the City/Parish the right to restore that natural drain, which is what they were attempting to accomplish by digging the new ditches. The City/Parish argues that its failure to institute an expropriation proceeding does not result in its action being a trespass, but only entitles the plaintiffs to inverse condemnation damages.
The court of appeal found that this did not qualify as an inverse condemnation suit because "[d]espite their attempts on appeal to characterize their actions as something other than trespass, the defendants have not established a lawful reason for their presence on plaintiffs' property, such as an exercise of the power of eminent domain." 715 So.2d at 24.
We recognized a landowner's right to compensation where the state fails to properly expropriate his property in Reymond v. State Through Dept. of Highways, 255 La. 425, 231 So.2d 375 (1970). We held that "[s]ince a taking or damaging of property may in fact occur without expropriation proceedings by a public body through oversight or lack of foresight, there must be some proceeding whereby an owner may seek redress when his property is damaged or taken without the proper exercise of eminent domain." Reymond, 231 So.2d at 383 (emphasis added). "Such an action is often referred to as `inverse condemnation', and our Article 1, Section 2, and Article 4, Section 15, support a proceeding in the nature of inverse condemnation by such an affected property owner." Id.
In order to determine whether property rights have been "taken" under La. Const. Art. 1, Sec. 4, which provides that property shall not be "taken or damaged" by the state or its political subdivisions except for public purposes and with just compensation paid to the owner, the court must (1) determine if a right with respect to a thing or an object has been affected; (2) if it is determined that property is involved, decide whether the property has been taken or damaged in a constitutional sense; and (3) determine whether the taking or damaging is for a public purpose under Article 1, Sec. 4. Constance v. State Through Dept. Of Transp. and Development Office of Highways, 626 So.2d 1151, 1157 (La.1993); State Through Dept. Of Transp. and Development v. Chambers Investment Co., Inc., 595 So.2d 598 (La.1992). Clearly, plaintiffs property has been "taken" and they are thus entitled to inverse condemnation damages for the damage to their property as a result of the taking.
The City/Parish claims that under Reymond and Gray v. State Through Dept. of Highways, 250 La. 1045, 202 So.2d 24 (1967), the plaintiffs are limited to an inverse condemnation action, and are not entitled to any damages under general tort law.[1] In Reymond, we held that "damages *247 which cause discomfort, disturbance, inconvenience, and even sometimes financial loss as an ordinary and general consequence of public improvements are not compensable, and are considered damnum absque injuria [loss without injury in the legal sense]." 231 So.2d at 383. In Gray, because of a technical error in its expropriation proceeding, the State, although it was acting in good faith for public purposes, failed to properly expropriate the landowners' property. We held that the landowners were not entitled to damages under 2315 for trespass, but could only recover the same damages as they could have had the land been properly expropriated, which amount would guarantee full compensation for the taking. 202 So.2d at 29. We held that "according to well-settled jurisprudence, this measure of compensation is to be estimated by the same standards whether the property taken is formally expropriated in accordance with law or appropriated by the condemning authority so long as it is intentionally taken for a public use." Id. "Albeit in appropriation cases the condemning authority does not obey the mandate of the law that the compensation be paid before the taking, the non-compliance of this condition precedent to the condemnation does not subject the appropriator to a penalty, for when the owner recovers just compensation, he recovers all the law gives him." Id. at 30. "To hold otherwise would be to inflict punitive damages upon the condemnor which is not permissible under our civil law system." Id.
However, in Gray, we specifically held that under the facts presented, the State did not commit a tortious act, and it was not a bad faith trespasser. Instead, the State had a valid good faith reason for not complying with the technical requirements in obtaining a servitude[2] and thus we "reiterate[d] that plaintiffs exhibit no case under Article 2315 of our Civil Code, for that Article imposes liability for damages on those who inflict injury on others through a tortious act; no tort was committed here and plaintiffs suffered no damages cognizable under that codal article." Id. In addition, we held that plaintiffs were not entitled to damages for trespass because they unjustifiably failed to take any action to prevent the appropriation.
The important features that distinguish the case at bar from the above cases is that, although the City/Parish may have been acting "for a public purpose," the City/Parish did not fail to undertake expropriation proceedings "through oversight or lack of foresight," as mentioned in Reymond, or as a result of a good faith error, as in Gray. Instead, after a judge refused to issue a judgment allowing them to go onto plaintiffs' land and clear the "natural drain," and after the police department's legal advisor and the assistant parish attorney told them that they needed a court order, the City/Parish took the matter into their own hands, and dug three wide canals across all three properties over a course of one-two months accompanied *248 by 24-hour armed security.[3]
We agree with the lower courts that the City/Parish was a bad faith trespasser and is liable for all the resultant damages under Article 2315. In addition, we must point out that the City/Parish has not even proven that if they had sought to properly expropriate the property, that a court could have found a sufficient basis for allowing them to do so. Moreover, even if they had been able to show that expropriation was an appropriate remedy, the City/Parish has made no showing that a court would have allowed them to excavate the ditches on plaintiffs' property. In fact, witnesses testified that the ditches did not even solve the flooding of Staring Lane.
Thus, the lower courts were correct in finding that the plaintiffs are not limited to an inverse condemnation action. This is consistent with our holding in State, Through Dept. of Highways v. Ellender, where we held that the defendant landowners in an expropriation suit were entitled to assert reconventional demands against the State in tort for damage to their crop. 379 So.2d 1069 (La.1980).[4] We hold that in addition to property damages resulting from this inverse condemnation, plaintiffs are also entitled to general damages under Article 2315. See also Gaspard v. St. Martin Parish Sewerage Dist. #1, 569 So.2d 1083 (La.App. 3 Cir. 1990) (mental anguish damages awardable where governing authority laid unauthorized sewage line across property); M & A Farms, Ltd. v. Town of Ville Platte, 422 So.2d 708 (La.App. 3 Cir.1982) (town committed a continuing trespass by laying a sidewalk without obtaining a written right of way; mental anguish not awarded because a corporate plaintiff cannot experience mental anguish); Pearce v. L.J. Earnest, Inc., 411 So.2d 1276 (La.App. 3 Cir.), writ denied, 414 So.2d 377 (La.1982) (plaintiffs allowed to recover damages in tort where governing cleared right of way of private property "with no color of authority, notwithstanding notice of the probable invalidity of their actions"); McCloud v. Jefferson Parish, 383 So.2d 477 (La.App. 4 Cir.1980) (Lemmon, concurring) (once government undertakes to improve drainage, it has a duty to perform this function according to reasonable standards and in manner which does not cause damage to particular citizens under Article 2315); Arnold v. Town of Ball, 94-972 (La App. 3 Cir. 2/1/95), 651 So.2d 313 ("The fact that Article 1, Section 4 limits Plaintiffs' recovery to property damages does not preclude them from recovering damages for the loss of use of enjoyment of their property, mental anguish, irritation, anxiety, discomfort, and embarrassment under Article 667 or Article 2315"); Simmons v. Board of Com'rs of Bossier Levee Dist., 624 So.2d 935 (La.App. 2 Cir.1993) (plaintiffs awarded mental anguish damages in inverse condemnation action); Ursin v. New Orleans Aviation Bd., 506 So.2d 947 (La.App. 5 *249 Cir.1987) (plaintiffs entitled to recover for property damage under inverse condemnation and for personal injury or property damage that was not a taking under Arts. 667-669 and 2315).

Damages
Because the City/Parish's action was unlawful, their entrance onto plaintiffs' land constitutes a trespass which resulted in damage to plaintiffs' property. "Justice, reason, and the principle of full reparation of La. C.C. art 2315 require that, where an individual's property is damaged unlawfully by a tortfeasor for no good reason, the owner be compensated at least as fully as when his property is damaged by the state for a public purpose." Roman Catholic Church of Archdiocese of New Orleans v. Louisiana Gas Service Co., 618 So.2d 874, 876 (La.1993). The landowner must be compensated not merely with the market value of property taken and severance damage to his remainder, but must be compensated to the full extent of his loss and placed in as good a position pecuniarily as he enjoyed prior to the taking. Id.; State Through Dept. of Highways v. Constant, 369 So.2d 699 (La.1979).
The City/Parish claims that several of the property damage awards are excessive. The trier of fact is given much discretion in the assessment of damages. Upon appellate review, damage awards will be disturbed only when there has been a clear abuse of that discretion. La. C.C. art. 2324.1; Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993).
The Gages were awarded $56,000 in property damages. The City/Parish claims that $16,067 was for the value of land taken in the 300 foot servitude and $30,050 was for the cost to cure the land taken in the 300 foot servitude and that because the Gage family was compensated for this taking in 1954, they have no right to recover for its damage today. The Court of appeal found that the award of $56,000 was reasonable because the plaintiffs' expert testified that the difference between the value of the tract before and after the taking was between $40,000 and $155,000 and that based on this method of valuation, there was no need to consider the City/Parish's argument.
The City/Parish's argument can only succeed if one of the new ditches, specifically the front ditch, actually followed the same lines as the 300 foot servitude. However, from our review of the record, we find that it is unclear where the 300 foot servitude was located. The only documentary evidence produced by the City/Parish as to the 300 foot servitude was the 1954 right of way deed which described a "lateral" servitude, while several witnesses testified that the servitude ran at an angle. In addition, a DPW witness testified that the new ditches did not follow the "natural drains" but instead followed the shortest distance from the culvert box to through the property. As to the amount of damages, plaintiffs' expert testified that value of the land taken in the front ditch was $16,067, calculated by multiplying 31,380 square feet at $28,000.00 per acre by 80%. He further testified that the cost to cure the front ditch was $16,500, which involved installing a crossing over the ditch with a 72 inch pipe culvert, 50 feet long at $250 per foot and two end walls at a cost of $4,000. In this instance the cost to cure is an appropriate measure of the damage to the remainder of the property as the value of the property is diminished by the lack of access across the property because of the ditches. Gray, supra, 202 So.2d at 28 (the measure of just compensation is "the market value of the land and whatever severance or consequential damages he has sustained by reason of the diminution in market value of the remaining property not taken.") In the absence of compelling evidence that the DPW dug the front ditch along the 300 foot servitude, we find that the trial court's award of damages is not an abuse of the trial court's vast discretion.
The City/Parish also claims that the lower courts erred in awarding the *250 Raby family $40,000 in severance damages. The plaintiff's expert testified that $40,000 was the difference in the value of the land before and after the excavation of the ditches. The trial court had also awarded the Raby's $30,500, which represented the cost of building a culvert crossing over each ditch, but the court of appeal properly ruled that Raby could not recover the value of the land taken, the cost to cure, and the difference in the value of the land before and after the taking. Consequently, the court of appeal subtracted the $30,500 cost to cure award from the amount awarded by the trial court. Since the $40,000 in severance damage is supported by the record, the court of appeal did not err in awarding the Raby family $40,000 instead of $30,500.
The City/Parish also claims that the Williams' family property damage award is excessive in that contains $29,000 for the cost to cure. Yet, plaintiffs' expert testified that, as with the Raby's and the Gage's, it would cost $30,500 to put a culvert crossing over two ditches. Since the record supports this award, the court of appeal did not err in awarding it.
The City/Parish next claims that the $51,860 awarded to the Rabys for damage to their motel parking lot caused by the heavy construction equipment is excessive. Plaintiffs' expert testified that this was the cost to repair the damage and plaintiffs' proved by a preponderance of the evidence that the construction equipment caused the damage. We find after reviewing the record that this award was not an abuse of discretion.
The City/Parish claims that the awards for all plaintiffs' property damage was excessive because the land was used as a dump and the presence of toxic substances would greatly reduce the value of the land. However, the City/Parish presented no evidence that the soil contained toxic or hazardous substances as a result of any dumping. In the absence of such evidence, the property damage awards will not be disturbed.
Finally, the City/Parish claims that the plaintiffs are not entitled to mental anguish awards, and, if they are, the mental anguish damages awarded by the lower courts are excessive.
In reviewing the amount of general damages awarded, we are guided by the standard we enunciated in Youn v. Maritime Overseas Corp., regarding the review of general damages:
[T]he discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
This Court has specifically recognized the right of one wronged by trespass upon his property to recover general damages, including damages for mental anguish. Ard v. Samedan Oil Corp., 483 So.2d 925 (La.1986).[5] However, in this *251 case, the amount of mental anguish awards are clearly beyond that which a reasonable trier of fact could assess. The trial court divided the Williams and Gage into three classes for the purpose of awarding mental anguish damages. Class I consisted of members of the Gage and Williams families who lived on the land when the trespass occurred. Louise Howard of the Williams family was awarded $88,000; Beatrice Gage Harris and Irma Gage Carr were awarded $75,000 each and Earline Gage Howard was awarded $47,500[6]. Class II was described by the plaintiffs as direct heirs who did not live on the property, but who grew up on the property, visited their family on the property and who felt a tie to the land. Six members of the Williams family were awarded $28,000 each for their mental anguish. Five members of the Gage family were awarded varying amounts for mental anguish: Ophelia Simmons, Lubertha Ethel Gage Johnson, and Evelyn Gage Sagna were awarded $28,000 each; Ulysess Gage, Sr. (substituted by his sons Leroy and Ulysses, Jr.) was awarded $20,000; and Leonard Gage (substituted by his children) was awarded $10,000. The Class III plaintiffs were the remaining heirs who had no direct connection with the land and who were not awarded damages for mental anguish. Finally, John Raby was awarded $88,000 and his wife Ida Jane Raby was awarded $75,000. The Raby's two adult children, John Raby, Jr. and Kathy Raby, who lived with them at the time, were awarded $25,000 each for their mental anguish.
Our review of the testimony of the Rabys and several of the Class I and II plaintiffs at trial supports the lower courts' finding that these parties did indeed suffer mental anguish as a result of the City/Parish's excavation project. Mr. and Mrs. Raby testified as to the constant aggravating noise produced by the heavy construction equipment which operated on their property for approximately two months from 6:00 a.m. to 6:00 p.m., and which were running even when the machines were not in use. The noise caused them to forgo enjoyment of their regular hobbies and caused stress. Mrs. Raby had to take more medicine for her asthma because of the dust and this increase in medicine affected her heart condition. Mr. Raby suffered embarrassment by the public exposure created by the newspaper photograph of him on the front page of the Baton Rouge newspaper on January 9, 1984 in connection with the excavation and the presence of police and private security cars parked outside their property 24 hours a day.
The Class I Williams and Gage plaintiffs testified that their families had worked hard to buy this property which was now broken up into three pieces. The presence of armed police officers and security guards scared them. Family reunions which took place frequently were now discontinued because of the condition of the property. They testified that the property was now dangerous because of the open ditches and because of the increased amount of rats, snakes and other vermin that inhabited the property as a result of the open ditches, which caused them to curtail their outdoor activities. Several Class II plaintiffs testified that they no longer liked to visit the property and that because of the ditches, they could no longer reach the spots where they used to garden. They testified that they were saddened over the condition of the property because they had been raised on the property and had so many memories there.
*252 While we agree that these plaintiffs suffered mental anguish as a result of the City/Parish's intentional and wrongful act in excavating ditches on their property, the amount of damages awarded by the trial court and affirmed by the court of appeal are "beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff[s] under the particular circumstances." In Youn, we held that after an appellate court has found an abuse of direction, it may undertake a comparative analysis to determine the highest and lowest points which are reasonably in the discretion of the court. Youn, supra at 1260.
We have reviewed cases awarding damages for mental anguish when property has been damaged and have found that the awards a range from $35,000.00 to $100.00. Ard v. Samedan Oil Corp., supra; Hardy v. Poydras, 98-0544 (La.App. 4 Cir. 1/13/99), ___ So.2d ___, 1999 WL 25582; Lott v. Lebon, 96-1328 (La.App. 4 Cir. 1/15/97), 687 So.2d 612, writ denied, 97-0359, 97-0414 (La.3/21/97), 691 So.2d 95; Barr v. Smith, 25,431 (La.App. 2 Cir. 1/19/94), 631 So.2d 76, writ denied, 94-0689 (La.4/29/94), 637 So.2d 466; Simmons v. Bd. of Comm. of Bossier Levee District, supra; Bryant v. Sears Consumer Financial Corp., 617 So.2d 1191 (La.App. 3 Cir.), writ denied, 619 So.2d 533 (La.1993); Cutrer v. Illinois Cent. Gulf R. Co., 581 So.2d 1013 (La.App. 1 Cir.1991), writ denied, 588 So.2d 1120 (La.1991); Snell v. United Parcel Services, Inc., 543 So.2d 52 (La.App. 1 Cir.), writ denied, 545 So.2d 1040 (La. 1989). We find that based on this range, the following amounts are the highest awards that a reasonable trier of fact could have given to compensate plaintiffs for their mental anguish: Class I: Louise Jackson$30,000; Beatrice Gage Harris and Irma Gage Carr$25,000, each; Earline Gage Howard$12,500. John Raby: $35,000; Ida Jane Raby: $30,000; Class II: Houston Williams, Willie Williams, Leroy Williams, Bernice (Williams) Christopher, Gloria (Williams) Taylor and Alzetia (Williams) Davis: $5,000 each; Ophelia Simmons, Evelyn Gage Sagna and Lubertha Ethel Gage Johnson: $5,000 each; Leonard Gage: $2,000; Ulysses Gage, Jr. and Leroy Gage: $2,000 each. John Raby, Jr. and Kathy Raby: $5,000 each.

Insurance Coverage
During the time of the excavation project, the City/Parish was insured by F & C under a commercial general liability policy, in excess of the City/Parish's $100,000 self-insurance retention. The F & C policy has liability limits of $400,000. F & C did not file a writ application and thus the lower courts' finding that the City/Parish is covered under the F & C policy is final.
Chicago provides excess liability insurance for the City/Parish. We granted Chicago's writ application to consider whether coverage is excluded under that policy's "intentional act" exclusion.
Chicago's policy is an occurrence based policy providing coverage as follows:
The company agrees to indemnify the insured for all sums for which the insured shall become obligated to pay as damages, direct or consequential, and expenses, all as hereinafter defined as included within the term ultimate net loss, by reason of liability ... imposed upon the insured by law ... because of personal injury, property damage, or advertising liability caused by or arising out of an occurrence which takes place during the policy period.... (Emphasis added.)
"Occurrence" is defined in the Chicago policy as:
an accident, including a continuous or repeated exposure to conditions, which results, during the policy period, in a personal injury, property damage, or advertising liability neither expected nor intended from the standpoint of the insured.... (Emphasis added.)
In its original judgment, the trial court found that coverage was excluded because "it is not conceivable that the *253 action and results thereof by Defendant City/Parish through the DPW were not intended from the standpoint of the insured." On motion for new trial, the trial court reversed its judgment and found that the acts by the City/Parish were covered, finding that the evidence showed that the serious emotional damage was not subjectively intended. The court of appeal affirmed, finding that
"the evidence supports the trial court's implicit factual finding that the City/Parish did not subjectively intend or expect the injury it caused. From the perspective of the City/Parish officials undertaking the DPW excavation project, they believed they were duly exercising the City/Parish's power of eminent domain. Mayor Screen, mistaken as to the legal rights of the City/Parish, and Director Addison took action they believed served the public welfare. We cannot say the trial court was manifestly erroneous or clearly wrong concluding the personal injury was neither expected nor intended from the standpoint of the City/Parish in light of the evidence in this record.
"As with any exclusion in an insurance policy, the insurer bears the burden of proving that the intentional injury provision is applicable." Great American Ins. Co. v. Gaspard, 608 So.2d 981, 984 (La. 1992). "Exclusions must be narrowly construed and any ambiguity should be construed in favor of coverage." Id.; Breland v. Schilling, 550 So.2d 609 (La.1989).
The purpose of the intentional injury provision is "... to prevent an insured from acting wrongfully with the security of knowing that his insurance company will `pay the piper' for the damages." Breland, supra at 610. "[N]ot all injuries resulting from an intentional act will be excluded, but only those injuries that were themselves intended." Yount v. Maisano, 627 So.2d 148, 152 (La.1993) (citing Breland, supra; Great American Insurance Co., supra). "The subjective intent of the insured, as well as his reasonable expectations as to the scope of his insurance coverage, will determine whether an act is intentional. An act is intended if the perpetrator desires the results of his action or he believes that the results are substantially certain to occur." Yount, supra; Great American Insurance Co., supra; Breland, supra. "As for the reasonable expectation of the insured regarding the scope of his coverage, this court has held that:
... when minor bodily injury is intended, and such results, the injury is barred from coverage. When serious bodily injury is intended, and such results, the injury is also barred from coverage. When a severe injury of a given sort is intended, and a severe injury of any sort occurs, then coverage is also barred. But when minor injury is intended, and a substantially greater or more severe injury results, whether by chance, coincidence, accident, or whatever, coverage for the more severe injury is not barred."
Yount, supra at 152 (citing Breland, supra at 614).
Thus, first we consider whether damage to plaintiffs' property accompanied by the resultant mental anguish was intended by the City/Parish, i.e. did the City/Parish desire the results of its action or believe that the results were substantially certain to occur. Clearly, the City/Parish knew that the property damage would occur and it must have realized that the landowners and their families were substantially certain to suffer mental anguish as a result. Property damage and landowner's mental anguish are all certain to occur when a party digs large ditches with heavy construction equipment through private property without the landowner's consent continuously over a two month period accompanied by 24-hour security. The court of appeal's finding that the City/Parish's actions were covered under Chicago's policy because the Mayor and Director Addison believed in good faith that they were acting pursuant to the City's eminent domain power is contradicted *254 by the evidence which shows that they got two legal opinions advising them that they could only go onto plaintiffs' land with a proper court order, yet the judgment in place was limited to prohibiting Mr. Raby from any further dumping and instructing the parties to work out a solution to solve the drainage problem. The City/Parish took advantage of its dominant government position, with its accompanying access to heavy construction equipment and armed police officers and security guards, and forced a result which it knew was not authorized.
Secondly, we consider the City/Parish's reasonable expectation as to the scope of its insurance coverage. If the City/Parish had properly taken this property in an expropriation proceeding, or by virtue of an inverse condemnation action, it would have paid the plaintiffs just compensation for the taking and this compensation would not have been covered by insurance. Surely, the City/Parish did not believe that if it took the property wrongfully and without authority, that any damages it caused would be covered by insurance. Thus, we find that the City/Parish did not reasonably expect coverage for its wrongful act under Chicago's excess policy.

CONCLUSION
Where the City/Parish, protected by police officers, entered plaintiffs' property with heavy construction equipment and excavated three large ditches through the property without plaintiffs' consent, knowing that court authority would be required before such excavation could be done, the City/Parish committed a trespass which resulted in extensive property damage and mental anguish to the landowners. Accordingly, plaintiffs are entitled to compensation for their property and mental anguish damages under general tort law. However, because the amount of damages awarded by the lower courts for mental anguish were excessive, we have reduced these awards. Finally, because the City/Parish committed an "intentional act," its actions are excluded under its excess insurance policy's "intentional act" exclusion.

DECREE
For the reasons stated herein, the judgment of the court of appeal is affirmed in part, reversed in part, and amended.
AFFIRMED IN PART; REVERSED IN PART; AMENDED.
KNOLL, J., dissents in part and assigns reasons.
KNOLL, J., dissenting in part.
For the following reasons, I respectfully dissent from the majority's reduction in mental anguish damages and its determination that the actions of the City/Parish are excluded from the excess coverage provided in the Chicago Fire Insurance Company policy.
It is evident that the trial court and the appellate court reviewed the mental anguish damages in light of the particular injuries to the particular plaintiffs under the particular circumstances presented. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). On the basis of the facts detailed in the appellate court decision, Williams v. City of Baton Rouge, 96-0675 (La.App. 1 Cir. 4/30/98), 715 So.2d 15, 31-32, I cannot say that the trial court abused its great discretion in making these particularized awards.
I likewise find that the Chicago policy provides excess liability insurance for the City/Parish and coverage is not excluded under the policy's "intentional act" exclusion. In Breland v. Schilling, 550 So.2d 609, 610 (La.1989), we found that not all injuries resulting from an intentional act will be excluded, but only those injuries that were intended. Although the City/Parish knew that property damage would occur, there has been no showing that it intended to inflict severe mental anguish damages. Rather, as the trial *255 court found "although [the City/Parish's] actions in attempting to cure the drainage problem was done intentionally, there was no intention to cause emotional damage to the plaintiff[s]." On this basis, I do not find coverage is excluded under Chicago's "intentional act" exclusion.
NOTES
[*] Traylor, J., not on panel. Rule IV, Part 2, § 3.
[1] The City/Parish also claims that under Gray, the plaintiffs damages must be reduced because they failed to mitigate their damages by not seeking an injunction when the DPW workers first arrived on the property. It claims that the trial court's finding that the "the three plaintiff groups failed to do anything to mitigate the damages" and that "they felt the golden goose had landed on their property and let it go" necessitates a reduction in damages. In Gray, we held that "an owner of land who is aware that his property is being appropriated for public use and stands aside taking no action to prevent the appropriation, cannot thereafter treat the appropriation as tortious." 202 So.2d at 31. We held that in such a case, the landowner is limited to just compensation for the property taken. Id. However, in this case, Mr. Raby strenuously objected when the DPW workers arrived on his property and demanded a court order. The DPW and police officers only proceeded with the excavation after getting a "direct order" from the Mayor. Mr. Raby attempted to contact his lawyer on Friday but could not reach him. The DPW then commenced the excavation work on that Friday and worked all weekend, doing much of the damage during that time. An injunction on Monday would have been too late. Accordingly, we find the plaintiffs' damages should not be reduced on this ground.
[2] In Gray, the State properly obtained a borrow pit servitude on the east side of a highway and, before it had begun digging on that servitude, it filed an amended petition and got a court order to expropriate the same amount of land for a borrow pit servitude on the west side of the highway instead. However, the expropriation was invalid because the State did not obtain a new appraisal of the property expropriated. We held that "the obvious reason for the Department's failure to appraise the value of the temporary servitude and deposit the market value and severance damages in the registry of the court, at the time the supplemental and amending petition of expropriation was filed, was because the Department, under this supplemental petition and order, was restoring to plaintiffs the temporary unused servitude validly expropriated on the east side of the highway, for which just compensation had been paid." 202 So.2d at 30.
[3] While not ruling on whether Raby did in fact have a "natural drain" running through his property, we note that the City/Parish is correct in that a landowner cannot block natural drainage on his property. Terrebonne Parish Police Jury v. Matherne, 405 So.2d 314 (La.1981). However, if he does so, the relevant governing body's authority is to seek an injunction to stop the landowner from blocking the drainage, which the City/Parish did in this case. Id. The Matherne case does not authorize the governing body the power to dig new drainage on a landowner's property.

The City/Parish is also correct that La. R.S. 38:113 authorizes a levy or drainage district to preserve and maintain the efficiency of public drainage channels and to enter private property along public drainage channels for a space of 100 feet on each side of the channel. However, the City/Parish was not acting under this authority when it entered plaintiffs' property because they presented no evidence that the "natural drain" was a "public drainage channel" and to the extent that the 300 foot servitude was a "public drainage channel," La. R.S. 38:113 only gives them the authority to preserve and maintain its efficiency, not dig three new ditches.
[4] In Ellender, we specifically overruled two 1932 cases which had limited the issues in expropriation proceedings to the value of the part taken and damages to the remainder. 379 So.2d at 1072.
[5] Damages are generally awarded in property damages cases when the property is damaged by: (1) an intentional or illegal act; (2) an act for which the tortfeasor will be strictly or absolutely liable; (3) acts constituting nuisance; or (4) acts occurring when the owner is present or at the time, or shortly after, damage was negligently inflicted and suffers psychic trauma as a result. Atwood v. Hylan, 28,971 (La.App. 2 Cir. 12/11/96), 685 So.2d 450; 1900 Partnership v. Bubber, Inc., 27,475 (La.App. 2 Cir. 11/1/95), 662 So.2d 808, writ denied, 96-0037 (La.2/28/96), 668 So.2d 369; Freyou v. Iberia Parish School Bd., 94-1371 (La.App. 3 Cir. 5/3/95), 657 So.2d 161; Blache v. Jones, 521 So.2d 530 (La.App. 4 Cir.1988); Louisiana Farm Bureau Mut. Ins. Co. v. Dunn, 484 So.2d 853 (La.App. 1 Cir. 1986).
[6] The judgment actually awards $9,500 to three Gage family members (Beatrice Gage Harris, Irma Gage Carr, and Lubertha Ethel Gage Johnson) who were substituted on behalf of Earline Gage Howard who died in June of 1989 and further awarded to Leroy Gage and Ulysses Gage, Jr. $9,500 each who were substituted as plaintiffs for their father Ulysses Gage, Sr., who died in September of 1991, for a total of $47,500.