855 So.2d 930 (2003)
Wayne M. PENDER and Andrew Ordell Milstead, Jr., Plaintiffs-Appellants,
v.
Mary Lee ELMORE, et al., Defendants-Appellees.
No. 37,690-CA.
Court of Appeals of Louisiana, Second Circuit.
September 24, 2003.
*931 H. Herbert Hobgood, Monroe, for Plaintiffs-Appellants.
Sir Clyde Lain, Monroe, for Mary Lee Elmore, Edna McCauley Thomas, Leondra D. Julks, Marlis McGee, and Terri McCauley.
Tracy W. Houck, for Randy Carpenter.
J. Michael Hart, Monroe, for Sidney Stokes and Martin Gardner.
F. Williams Sartor, Monroe, for Capital City Insurance Co.
Mary Alice Bryant, Monroe, for Frank Toston.
Sam O. Henry, IV, for Willie DeBurr.
*932 Before WILLIAMS, GASKINS and CARAWAY, JJ.
CARAWAY, J.
This appeal stems from a timber cutting dispute involving co-owners of land, parties in the timber industry who cut or sold the timber, and the insurance company for the actual timber cutter. Two summary judgments were granted by the trial court. The first summary judgment concerned the issue of insurance coverage which the trial court found lacking. Since we find that the policy coverage extends to intentional conduct so long as the insured did not subjectively expect the resulting damages, there are material fact issues which require reversal of the summary judgment. The second summary judgment found no vicarious liability on the part of two parties who allowed the harvested timber to be sold under their contracts with the timber mills. Since those parties exercised no control over the defendant who actually cut the timber, we affirm the trial court's grant of the second summary judgment.

Facts
Plaintiffs/Appellants, Wayne M. Pender ("Pender") and Andrew O. Milstead, Jr. ("Milstead"), filed suit against their co-owners and others for the alleged wrongful harvest of timber from an 80 acre tract of land in Ouachita Parish. The petition alleged that during March, 1999, defendant Willie DeBurr obtained consent for the timber sale from at least two non-resident co-owners, Mary Lee Elmore ("Elmore") and Edna McCauley ("McCauley"). DeBurr then contacted Randy Carpenter ("Carpenter") to cut down the timber and haul it to area mills. The plaintiffs alleged only that they owned more than an undivided 20% in the land, and that Carpenter's harvest of timber from the tract without their consent violated the provisions of La. R.S. 3:4278.2(B), which requires consent from at least 80% of the co-owners of land. The petition further alleged that defendants, Sydney Stokes ("Stokes") and Martin Gardner ("Gardner") were vicariously liable for plaintiffs' damages because of an employment relationship existing between them and Carpenter. Pender and Milstead prayed for treble damages for the market value of the timber and attorney's fees under La. R.S. 3:4278.1, or alternatively, to annul the timber sale as lesionary.
By amended petition, plaintiffs added Carpenter's general commercial liability insurer, Capital City Insurance Company, Inc. ("Capital"). Capital answered, denying that the action sued upon by plaintiffs was covered under the policy. After Stokes and Gardner asserted a third-party demand against Carpenter and Capital, Capital moved for summary judgment against the plaintiffs on the policy coverage issue. After a hearing, the trial court found no coverage under the policy and ruled in favor of Capital, dismissing plaintiffs' original demand. The summary judgment, however, did not address Stokes and Gardner's third-party demand against Capital.
Following the rendition of the initial summary judgment, the plaintiffs moved for a new trial for reconsideration of the coverage ruling. Additionally, Capital moved for summary judgment against Stokes and Gardner for the dismissal of their third-party demand. Stokes and Gardner, in turn, filed a motion for summary judgment against the plaintiffs, denying that they were vicariously liable for Carpenter's cutting of the timber. The motion for new trial and the two motions for summary judgment were all heard together by the trial court on December 2, 2002. By that time, various other affidavits and Carpenter's deposition were before *933 the trial court for its determination of the policy coverage issue and the claim for vicarious liability.
Pender and Milstead's motion for new trial included an affidavit from Carpenter dated September 18, 2002, stating that he did not intentionally cut timber on land owned by plaintiffs. Also, plaintiffs appear to have filed Carpenter's deposition which was inserted into the record on appeal pursuant to the trial court's order and La. C.C.P. art. 2132, authorizing the correction of an omission of a material part of the trial court record.
In his deposition, Carpenter testified that DeBurr, the timber buyer, contacted him in 1999 while he and his crew were harvesting timber on an adjacent tract. When Carpenter asked DeBurr "if the ownership was okay," DeBurr replied affirmatively and told him that he knew all of the owners and had a contract with Elmore, which he showed Carpenter to verify ownership. Carpenter described the contract as "informal, just giving DeBurr the right to purchase and cut the timber." The contract "listed Mary Elmore giving permission to Willie DeBurr to cut the said timber on Samantha Wood Estates for the purpose of taxes or something like that." The contract, although purportedly attached to Carpenter's deposition as an exhibit, is not included in the record on appeal. Carpenter described the contract as in letter form and signed by Mary Lee McCauley Elmore and Edna McCauley Thomas. DeBurr also told Carpenter there were two other owners of the property, Leondra Julks and Frank Toston.
Carpenter testified that "[DeBurr] purchased this timber from Mary Elmore and I was pretty much working for him cutting the timber on it." After DeBurr contacted him, Carpenter went to the Ouachita Parish Courthouse to check the ownership of the tract, something he did customarily. He discovered that the tax assessor's records showed that Elmore had paid the ad valorem taxes since the 1970's, and that she was also listed as a co-owner according to records in the Clerk's Office.
Carpenter telephoned Elmore in California in late February, 1999, to double-check DeBurr's account of the ownership. She told Carpenter there were four owners of the property including herself, her sister Edna McCauley, Frank Toston, and "the Julks." Carpenter testified that Elmore told him all four were giving permission for him to cut the timber. Therefore, he did not try to contact the other co-owners.
As Carpenter cut the timber, he paid the co-owners according to DeBurr's instructions regarding the price and its division. The price for hardwood pulpwood was $10/ cord and pinewood pulpwood was $15/cord. Elmore and McCauley were paid together by checks for $3,396.85 and $6,744.05; Toston was paid by a check for "about $1,000.00," and a second check to "split with Julks" for $1,381.50. At his deposition, Carpenter also produced invoices showing payments to DeBurr for commissions totaling $9,577.31.
Stokes and Gardner opposed Capital's motion for summary judgment on the coverage issue, also attaching Carpenter's affidavit. Stokes and Gardner also filed their personal affidavits on the issue of vicarious liability in which they averred that (i) they never entered into any contractual relationship with Carpenter, (ii) they never exercised any control over Carpenter's operations, (iii) they never purchased any insurance coverage for him or financed any equipment for him, (iv) Carpenter never advised them that he did not have adequate consent to cut the timber, and (v) they neither cut any timber themselves nor directed Carpenter to do so.
In response to the plaintiffs' motion for new trial, Capital moved to strike Carpenter's *934 affidavit, arguing that it was really intended to serve as evidence to support plaintiffs' opposition to Capital's first motion and was filed too late.[1] Alternatively, Capital argued that although Carpenter's affidavit stated that he did not "intentionally" cut timber on plaintiffs' land, Carpenter did in fact intentionally cut down the trees, as "[t]hat is what loggers do," and while he may not have known of plaintiffs' undivided ownership in the timber, he intended to cut down the trees just the same.
After the second hearing, the trial court dismissed plaintiffs' suit against Stokes and Gardner on summary judgment, denied plaintiffs' motion for a new trial as to the summary judgment in favor of Capital, and ruled that Capital's motion for summary judgment against Stokes and Gardner on the issue of coverage was moot.
It is from these judgments that plaintiffs appeal.

Discussion

I.
Plaintiffs argue in their first assignment that Capital failed to establish that no reasonable interpretation of its policy would afford coverage, and that the trial court erred when it dismissed Capital from the suit. Capital cites in support of its argument the following portions of its policy of insurance issued to Randy Carpenter, d/b/a Carpenter Logging:

SECTION I-COVERAGES

COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY
1. Insuring Agreement.
a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.
* * *
b. This insurance applies to "bodily injury" and "property damage" only if:
(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";
* * *
2. Exclusions.
This insurance does not apply to:
a. Expected or Intended Injury
"Bodily injury" or "property damage" expected or intended from the standpoint of the insured.
* * *
j. Damage to Property
"Property damage" to:
* * *
(4) Personal property in the care, custody or control of the insured;
(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

*935 (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

* * *

SECTION V-DEFINITIONS
12. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

* * *

15. "Property damage" means:
a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.
A policy endorsement modifying Exclusion (2)(j) provided property damage liability coverage caused by fire damage and overcutting of timber. The endorsement defines "Overcutting of Timber" "as the accidental and unintentional crossing of a property line or cutting area delineated, described or marked by surveyor...." Additionally, we note that the policy does not specifically exclude coverage for punitive damages.
An insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Louisiana Civil Code. Cadwallader v. Allstate Ins. Co., 02-1637 (La.6/27/03), 848 So.2d 577. The judiciary's role in interpreting insurance contracts is to ascertain the common intent of the parties to the contract. La. C.C. art.2045; Cadwallader, supra. Words and phrases used in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning. La. C.C. art.2047; Cadwallader, supra. An insurance contract, however, should not be interpreted in an unreasonable or strained manner under the guise of contractual interpretation to enlarge or to restrict its provisions beyond what is reasonably contemplated by unambiguous terms or so as to achieve an absurd conclusion. Id. The rules of construction do not authorize a perversion of the words or the exercise of inventive powers to create an ambiguity where none exists or the making of a new contract when the terms express with sufficient clearness the parties' intent. The determination of whether a contract is clear or ambiguous in a question of law. Id.
Exclusions must be narrowly construed and any ambiguity should be construed in favor of coverage. Williams v. City of Baton Rouge, 98-1981 (La.4/13/99), 731 So.2d 240, 253. As with any exclusion in an insurance policy, the insurer bears the burden of proving that the intentional injury provision is applicable. Great American Ins. Co. v. Gaspard, 608 So.2d 981, 984 (La.1992).
Though both parties debate in brief the meaning of the defined term "occurrence" in the Capital policy and the lack of definition of the word "accident," we find no ambiguity in the use of these familiar policy terms. In Nelson v. Want Ads of Shreveport, Inc., 31,168 (La.App.2d Cir.10/30/98), 720 So.2d 1280, 1282, this court stated:
Within the context of insurance coverage, the term accident or an equivalent reference to an act or event causing injury which was neither expected nor *936 intended from the standpoint of the insured has been construed by the courts to include not only the insured's negligent conduct, but also intentional conduct as long as the insured did not subjectively expect or intend the resulting injuries or damages. (Emphasis in text.)
The intentional conduct or "occurrence" which is the subject of this action is an alleged tortious conversion of timber or presumptive timber theft because of the asserted violation of La. R.S. 3:4278.2.[2] We have recently held that a violation of La. R.S. 3:4278.2 can result in punitive damages under La. R.S. 3:4278.1. McConnico v. Red Oak Timber Co., 36,985 (La.App.2d Cir.5/16/03), 847 So.2d 191.
In Williams, supra, our supreme court addressed the issue of insurance coverage for the defendant/city's "bad faith trespass" and unauthorized expropriation of the plaintiffs' lands for a drainage project. Following a trial, the plaintiffs were awarded damages for their inverse condemnation claim and resultant tort damages for the trespass, which were affirmed by the high court. The court then addressed the issue of insurance coverage and the policy's definition of the term "occurrence," which similarly employed the word "accident" and also contained the intentional injury provision requiring damages "neither expected nor intended from the standpoint of the insured." The court stated:
The purpose of the intentional injury provision is "... to prevent an insured from acting wrongfully with the security of knowing that his insurance company will `pay the piper' for the damages." Breland [v. Schilling, 550 So.2d 609 (La. 1989)], supra at 610. "[N]ot all injuries resulting from an intentional act will be excluded, but only those injuries that were themselves intended." Yount v. Maisano, 627 So.2d 148, 152 (La.1993) (citing Breland, supra; Great American Insurance Co., supra). "The subjective intent of the insured, as well as his reasonable expectations as to the scope of his insurance coverage, will determine whether an act is intentional. An act is intended if the perpetrator desires the results of his action or he believes that the results are substantially certain to occur." Yount, supra.

Id. at 253.
The court in Williams then proceeded to review the facts concerning the city's intentional actions upon the plaintiffs' property and determined that the lower courts were manifestly erroneous in holding that the intentional injury exclusion of coverage was inapplicable. Significantly, the court addressed the fact that the city's actions had resulted in an appropriation/taking of the plaintiffs' property which is analogous to the alleged conversion of timber in this case. The court observed:
Secondly, we consider the City/Parish's reasonable expectation as to the scope of its insurance coverage. If the City/Parish had properly taken this property in an expropriation proceeding, or by virtue of an inverse condemnation action, it would have paid the plaintiffs just compensation for the taking and this compensation would not have been covered by insurance. Surely, the City/Parish *937 did not believe that if it took the property wrongfully and without authority, that any damages it caused would be covered by insurance.

Williams, supra at 254.
Insurance coverage for another conversion of property was also involved in Nelson, supra, in which this court reversed the trial court's summary judgment of no coverage. After finding, as quoted above, that the policy provisions could extend to cover intentional conduct, we also held that the "alleged misappropriation or conversion" of the plaintiff's advertising product "fits the policy definition of property damage." In that case, as here, property damage was defined under the policy as physical injury to or the destruction of tangible property.[3] In the context of summary judgment, this court in Nelson could find no clear exclusion in the policy that precluded coverage for the conversion of the plaintiff's property so long as the insured/defendant neither expected nor intended the damaging results of his actions. In reversing the summary judgment, the court concluded that "[t]he policy definition of accident ... necessarily requires a factual determination as to the type and extent of injury or damage suffered by the plaintiff, and the state of mind of the defendants with respect to those injuries." Id. at 1283.
Comparing the results reached in Williams and Nelson, the different verdicts on insurance coverage for the conversion-type "occurrences" resulted more from the procedural context of the two cases. Williams found no coverage under the policy for the intentional actions of the defendant after a full trial on the merits, while Nelson was unwilling to affirm a summary judgment with material fact issues regarding the defendant's state of mind and the extent of damages to the plaintiff. We likewise find in this case that genuine issues of material fact remain regarding the extent and nature of the plaintiffs' loss, any concomitant profit by Carpenter, and Carpenter's state of mind. Accordingly, the trial court's grant of summary judgment in favor of Capital is reversed.

II.
Plaintiffs next assign as error the trial court's dismissal of defendants Stokes and Gardner, after finding that no employment relationship existed between them and Carpenter. They urge that Carpenter could only have sold the timber harvested from the tract and delivered to the timber mills by using Stokes and/or Gardner's contract numbers. Because Stokes and Gardner profited from Carpenter's sales, they should also share whatever liability is imposed on Carpenter. Stokes and Gardner argue that Carpenter was an independent contractor and that no employment relationship existed between them and Carpenter upon which vicarious liability could be imposed.
Under the doctrine of respondeat superior, employers are responsible for the torts of their employees committed during the course and scope of employment. La. C.C. art. 2320; Arledge v. Royal-Globe Ins. Co., 401 So.2d 615 (La.App. 3 Cir.1981), (citing Blanchard v. Ogima, 253 La. 34, 215 So.2d 902 (1968)). In determining whether an employment relationship exists, the jurisprudence of this state *938 has uniformly held that the most important element to be considered is the right of control and supervision over an individual. Savoie v. Fireman's Fund Ins. Co., 347 So.2d 188 (La.1977). Factors to be considered in assessing the right of control are the selection and engagement of the worker, the payment of wages, and the power of control and dismissal. Id.; Johnson v. Maricle, 386 So.2d 677 (La.App. 3d Cir.1980); Franklin v. Haughton Timber Co., 377 So.2d 400 (La.App. 2d Cir.1980), writ denied, 380 So.2d 624 (La.1980). The most important inquiry is whether the principal retained the right to control the work. In applying this test, it is not the supervision and control which is actually exercised which is significant; the important question is whether, from the nature of the relationship, the right to do so exists. Ledent v. Guaranty Nat'l Ins. Co., 31,346 (La.App.2d Cir.12/28/98), 723 So.2d 531; Slaughter v. Georgia Casualty & Surety Co., 415 So.2d 312 (La.App. 2d Cir.1982), writ denied, 420 So.2d 979 (La. 1982).
In Singleton v. Booker, 37,198 (La.App. 2 Cir. 5/14/03), 847 So.2d 107, this court reversed summary judgment in favor of the alleged employer based on its relationship with the timber cutter. The timber cutter testified that he had worked for the alleged employer for 32 years, was covered by the employer's insurance, and paid by the employer. Moreover, the timber cutter "was required to keep [him] informed of where he was cutting." The court observed:
... [A] woodcutter can, in economic reality, be the employee of one for whom he ordinarily cuts and hauls timber, and under whose name the wood is accepted by the mills.
Id. at 110.
The record indicates that Carpenter's decision to harvest the timber from the plaintiffs' land was the result of his dealings with DeBurr and Mary Elmore. He was not directed in his actions by either Stokes or Gardner. The record shows that Carpenter employed his own work crew in his timber operations, owned his own equipment, and provided his own insurance. His only involvement with Stokes and Gardner resulted from their having access to the timber mills through their contractual relations with the mills. Apparently, Carpenter was allowed to deliver the harvested timber to the mills under Stokes and Gardner's contracts and then receive payment from them after the mills had paid Stokes and Gardner. Other than this relationship, plaintiffs presented no evidence of the payment of wages or any other element of control exercised by Stokes and Gardner concerning Carpenter's actions on the plaintiffs' property.
In response to the motion for summary judgment by Stokes and Gardner, plaintiffs were required to produce factual support sufficient to establish that they would be able to satisfy their evidentiary burden demonstrating Stokes and Gardner's right to control the work of Carpenter for this timber operation. La. C.C.P. art. 966(C)(2). The record does not reveal any such evidence of control or the existence of an employment relationship as was present in Singleton, supra. Therefore, the trial court's grant of summary judgment in favor of Stokes and Gardner on the issue of vicarious liability is affirmed.

Conclusion
For the foregoing reasons, the summary judgment dismissing Capital from the proceedings is reversed, and the matter is remanded to the trial court. The summary judgment in favor of Stokes and Gardner is affirmed. Costs of the appeal are assessed one-half to plaintiffs, Pender and Milstead, and one-half to defendant, Capital.
*939 REVERSED IN PART, AFFIRMED IN PART, AND REMANDED.
NOTES
[1] Carpenter's affidavit and deposition were considered by the trial court in ruling on plaintiffs' motion for new trial. That evidence was also pertinent to the identical coverage issue which remained pending after the initial summary judgment because of Stokes and Gardner's third party demand against Capital. Under these circumstances, we do not find any abuse of discretion by the trial court in considering the evidence from Carpenter for its ruling on the plaintiffs' motion for new trial.
[2] We note that it can be argued that no sale of timber occurred in this setting, but that DeBurr and Carpenter were merely acting under the control and directives of the other defendant/ co-owners of the land. The relationship between co-owners for the cutting of timber is indirectly addressed in La. C.C. art. 798, where the remedy to the co-owners who do not participate in the harvest is provided in terms of an action for an accounting and not damages in tort.
[3] We reject Capital's contention that the "real property" exclusion (2)(j)(5) governs in this case because of the immovable status of the standing timber. The harvested timber became a movable under our law and its conversion would likewise fall within the coverage for destruction of tangible property. See, La. C.C. art. 463 and its Revision Comment (d).