862 So.2d 1197 (2003)
Sylvia COLE-GILL, et al., Plaintiffs-Appellants,
v.
Benny MOORE, et al., Defendants-Appellees.
No. 37,976-CA.
Court of Appeal of Louisiana, Second Circuit.
December 19, 2003.
Rehearing Denied January 22, 2004.
*1199 Tutt and Bordelon by Charles G. Tutt, Shreveport, for Appellants.
Daryl Gold, Shreveport, for Appellee Benny Moore.
David L. White, Jeffrey S. Delaune, Bossier City, for Appellee Allstate Timber Co.
Mayer, Smith & Roberts by Steven E. Soileau, Shreveport, for Appellee Continential National Indemnity Co.
Before CARAWAY, PEATROSS, LOLLEY, JJ.
LOLLEY, J.
Sylvia Cole-Gill and twenty-four other plaintiffs ("appellants") appeal the judgment of the Eleventh Judicial District Court for the Parish of DeSoto against Benny Moore, individually and d/b/a Piney Wood Timber Company ("Moore"), Allstate Land & Timber Company ("Allstate"), and Continental National Indemnity Company ("Continental National"). For the following reasons, the judgment is affirmed and amended in part and remanded as it pertains to Moore and Allstate and is reversed at it pertains to Continental National.

FACTS
This is a lawsuit arising from the alleged misappropriation and cutting of timber. A petition and two amended petitions were filed in the litigation, resulting finally in there being twenty-five named plaintiffs, some, but not all, of the descendants of Mattie and William Whorton, who had seven children. The appellants descend from three of the seven children.[1] The named defendants to the original lawsuit were Moore, Allstate, and Continental National, Allstate's liability insurer.
The appellants own an undivided interest in tracts of land approximating 40 acres in DeSoto Parish, Louisiana (the "property"), with their ownership interest approximating 37% of the property. There are thirty-one additional owners/coheirs of the property whose ownership interest is about 63%they were not plaintiffs in the litigation.
In January 2000, Moore did business as Piney Wood Timber Company. At that time, he approached Wardie Whorton Scherber ("Scherber") and her mother, Gladys Whorton ("Whorton"), at their residence *1200 located on the property.[2] Scherber and Whorton apparently told Moore they were heirs with an ownership interest in the property, and they informed Moore of other family members with ownership interests. Moore expressed his interest in buying the timber from the heirs to sell to Allstate, which would arrange for the timber to be cut.
On January 6, 2000, a timber deed was executed, listing seven Whorton heirs as sellers; however, only two persons Whorton and Scherberwere signatories on the deed (the "original deed"). The original deed purported to transfer 100% interest in the timber on the property, for a sales price of $28,000. Based on that price, Moore paid each of the listed sellers $4,000.00.
However, Allstate apparently miscalculated and over-valued the timber on the property. Knowing this, Moore prepared another deed identical to the original deed except for an altered sales price of $67,000 (the "forged deed"). The forged deed was ultimately recorded. Allstate then turned around and paid Moore $81,700 for the timber, and a second deed was executed by Moore to Allstate to effect the sale.
Allstate cut the timber. The parties stipulated that Allstate earned revenue of $100,683.15 from the sale of the timber. It was also stipulated that its cost of cutting and hauling was $41,770.92. The stipulated value of the timber was $58,912.23.
As a result of the unauthorized sale of the timber, suit was brought by the appellants. They claimed damages for the value of the timber and treble damages and attorney's fees pursuant to La. R.S. 3:4278.1. Allstate denied fault, claiming that it too was a victim of Moore, because it lost money in the timber deal as a result of Moore's misrepresentation regarding the timber's value. Continental National denied coverage under the terms of the commercial general liability policy (the "policy"). Ultimately, Moore was charged with and pled guilty to felony theft of timber. At the time of trial, he had made restitution in the amount of $21,950.
After a trial of the matter, the trial court rendered judgment without reasons and found Moore, Allstate, and Continental National liable, in solido, to the appellants in the amount of $25,248.09, subject to the payments in restitution made by Moore, leaving the remaining damages due the appellants $3,298.09. An appeal of that judgment ensued by the appellants, which appeal has been answered by Continental National.

DISCUSSION
On appeal, appellants argue that the judgment was in error, because the trial court failed to award treble damages and attorneys fees as stated in La. R.S. 3:4278.1. Specifically, the appellants maintain that Moore's and Allstate's actions required the imposition of treble damages and attorney fees. For the following reasons, we agree.
Louisiana R.S. 3:4278.1 states, in pertinent part, as follows:
A. It shall be unlawful for any person to cut, fell, destroy, remove, or to divert for sale or use, any trees, or to authorize or direct his agent or employee to cut, fell, destroy, remove, or to divert for sale or use, any trees, growing or lying on the land of another, without the consent of, or in accordance with the direction of, the owner or legal possessor, *1201 or in accordance with specific terms of a legal contract or agreement.
B. Whoever willfully and intentionally violates the provisions of Subsection A shall be liable to the owner or legal possessor of the trees for civil damages in the amount of three times the fair market value of the trees cut, felled, destroyed, removed, or diverted, plus reasonable attorney's fees.
C. Whoever violates the provisions of Subsection A in good faith shall be liable to the owner or legal possessor of the trees for three times the fair market value of the trees cut, felled, destroyed, removed, or diverted, if circumstances prove that the violator should have been aware that his actions were without the consent or direction of the owner or legal possessor of the trees.
Further, Louisiana R.S. 3:4278.2 (colloquially known as the "80% rule") states, in pertinent part, as follows:
B. A buyer who purchases the timber from a co-owner or co-heir of land may not remove the timber without the consent of the co-owners or co-heirs representing at least eighty percent of the ownership interest in the land, provided that he has made reasonable effort to contact the co-owners or co-heirs who have not consented and, if contacted, has offered to contract with them on substantially the same basis that he has contracted with the other co-owners or co-heirs.

* * * *
E. Failure to comply with the provisions of this Section shall constitute prima facie evidence of the intent to commit theft of the timber by such buyer.
As this court recognized in McConnico v. Red Oak Timber Co., 36,985 (La.App.2d Cir.05/16/03), 847 So.2d 191:
La. R.S. 3:4278.1 must be read in pari materia with its companion statute, La. R.S. 3:4278.2. R.S. 3:4278.2 provides that a co-owner of land may sell his or her undivided interest in the timber; however, the buyer cannot remove the timber without the consent of at least 80% of the ownership interest in the land. La. R.S. 3:4278.2(A) and (B). Failure to comply with the provisions of the statute constitutes prima facie evidence of intent to commit theft by the buyer. La. R.S. 3:4278.2(E). Accordingly, reference to "the owner or legal possessor" in La. R.S. 3:4278.1 must be construed to mean" "at least 80% of the ownership interest in the land."
Louisiana R.S. 3:4278.1 sets forth the categories of trespasser culpability, i.e., moral bad faith, legal bad faith (good faith but should have known), and good faith. As we also noted in McConnico, supra:
... the basis of damages for each category of culpability is a single measure, the "fair market value." Hence, in the current version of the statute: Section B penalizes the willful and intentional trespasser (moral bad faith) with damages equal to three times the fair market value of the trees cut, plus attorney fees; Section C penalizes the good faith trespasser who should have known his actions were without the consent of the owner (legal bad faith) with damages equal to three times the fair market value of the trees cut, but without attorney fees unless notice is given and disregarded. Finally, the good faith trespasser (who has no reason to suppose the timber does not belong to him) is not liable for treble damages under the statute. He is liable only for the fair market value. (Citations omitted).
The statute prohibiting the cutting of trees without consent and authorizing treble damages is punitive in nature and *1202 must be strictly construed. Sullivan v. Wallace, 33,387 (La.App.2d Cir.08/23/00), 766 So.2d 654, writ denied, 2000-2647 (La.11/17/00), 774 So.2d 978. It is only when a person clearly violates its provisions that he will be assessed the severe penalty of treble damages. Callison v. Livingston Timber, Inc., XXXX-XXXX (La. App. 1st Cir.05/09/03), 849 So.2d 649. As the facts in this case show, Moore and Allstate clearly violated La. R.S. 3:4278.1, and even under the strictest construction of the statute, are clearly those intended to be penalized with treble damages.

Moore's actions
Here, the facts show that Moore acted "willfully and intentionally" when he "divert[ed] for sale" the timber in this case and was in bad faith as envisioned under section B of La. R.S. 3:4278.1. Primarily, we note that criminal charges were brought against Moore in connection with the transaction, to which he pled guilty.[3] The offense to which he pled guilty, i.e., theft, requires "an intent to deprive another" of their property. Thus, in connection with the criminal proceedings regarding the timber at issue, Moore admitted to acting "willfully and intentionally." Furthermore, even without considering Moore's criminal guilty plea to felony theft, the testimony and evidence adduced in these civil proceedings also indicate that Moore acted "willfully and intentionally," because he failed to obtain the requisite approval by 80% of the heirs to legally consummate the purchase of the timber despite the fact that he had knowledge that the heirs existed.
Specifically, at trial Moore testified that he obtained the legal description of the property from records of the DeSoto Parish Assessor's office, which showed the property was assessed to Mattie and William Wharton. Moore admitted that the only people he met with personally in connection with the transaction were Scherber and Whorton. However, he claimed that he talked to "two or three different people by telephone," identifying Arthur Cole, another heir and appellant herein, as one of the people he spoke with over the phone. Although Moore stated that he sent some contracts out, not identifying to whom they were sent, he proceeded with the transaction despite the fact he never got the executed contracts back. Moore related that Scherber wrote the sellers' names on the top of the original deed, but that he took no effort to determine whether those were all of the heirs with an interest in the property, and instead he "just took [Scherber's] word for it." Moore stated that Scherber and Whorton signed on behalf of all the sellers, although he had no document giving them such authority.
Although Moore may not have known exactly how many heirs were involved, he obviously knew that there were seven branches of the family, because he had seven checks madeone to each branch of the family identified by Scherber. He knew that Scherber and Whorton, in some capacity, represented only one branch of the family. Even without knowing exactly how many heirs existed, by no stretch could Scherber and Whorton (who had no ownership interest in the property) account *1203 for 80% of the heirs. Moore was an experienced timber man, having been in the timber business since 1994, and he clearly had the requisite knowledge needed to legally carry through such a transaction. Without doubt, Moore acted "willfully and intentionally" when he failed to acquire the necessary approval from 80% of the heirs to consummate the purchase of the timber; therefore, the trial court erred when it failed to make such a finding and in failing to assess treble damages and attorney fees against Moore pursuant to La. R.S. 3:4278.1(A) and (B).

Allstate's actions
The appellants also argue that the trial court erred in failing to assess treble damages against Allstate, arguing that although Allstate may not have been as culpable as Moore, its actions demonstrated the sort of "legal bad faith" to which treble damages should be assessed pursuant to La. R.S. 3:4278.1(C). We agree that Allstate was culpable; however, as discussed herein, Allstate's actions tend to establish that it acted in bad faith and is liable under La. R.S. 3:4278.1(B).
The evidence at trial clearly indicated that Allstate was aware, or at the very least, should have been aware that Moore's actions, and subsequently Allstate's, were without the consent of the owner of the timber in question (i.e., that 80% of the heirs had not approved the sale). The record shows that Allstate: (1) had actual knowledge that the property was owned by the heirs of Mattie and William Whorton; (2) knew that Moore had approval of the sale only by some of the heirs; and, (3) most importantly, was aware of the 80% rule pertaining to the purchase of timber from heirs.
Allstate's representative and employee involved in this transaction was John Mills ("Mills"), who had more than twenty-five years of experience in the timber industry. The record reflects that Mills knew that the property was assessed to Mattie and William Whorton, and thus, owned in some capacity by their heirs. Specifically, at the trial of this matter, Mills testified that he was present when Moore first approached Scherber and Whorton about purchasing the timber. Mills acknowledged the difficulty of dealing with property owned by heirs to a succession. In fact, Mills testified that he ordinarily would examine Moore's documentation regarding the ownership of the property, and he was familiar with this particular property's legal ownership status. In fact, Mills acknowledged that he had seen the tax assessor's records pertaining to the property, and he was aware that the property was assessed to Mattie and William Whorton. Finally, and notably, when asked if he had to watch "his p's and q's" when "dealing with heir property," Mills responded affirmatively, further adding that he had failed to do so in this case.
Mills also explained that he had overheard Moore and Whorton discuss the other heirs, but that he had never received any documentation as to who those heirs might be or that Whorton and/or Scherber had authority to act on their behalf. Further, Mills testified that after receiving the forged deed from Moore, he noticed that Whorton and Scherber had signed for the heirs listed across the top, but that he made no investigation as to the propriety of such. Mills stated that he simply assumed the family was in agreement regarding the sale. Mills recklessly relied on that assumption, despite the fact that he was presented with an unrecorded deed from Moore[4] void of any documentation *1204 that Whorton and Scherber had the authority to act on behalf of the other branches of the family (i.e., a power of attorney). Finally, Mills admitted having knowledge that he needed the approval of 80% of the heirs in order to legally consummate the sale.
On appeal, Allstate contends that it too was a victim of the misdeeds of Moore, whom Allstate characterizes as the real "culprit" in this case. But, as the facts in this case show, that characterization is not accurate. Allstate argues that although its behavior in connection with this transaction may have been "lax," such practice was common in the industry. Furthermore, Allstate suggests that its "inference" that the heirs were in agreement was reasonable. However, such "lax" business dealings, based on mere assumptions and inferences, when Allstate had explicit knowledge of the property's ownership as well as Louisiana's 80% rule, are not reasonable. Allstate cannot insulate itself from liability merely by purchasing the property from Moore, whom Allstate characterizes as its "middleman," when (1) the public records indicate that the property was owned by the heirs; and (2) it had actual knowledge that the property was owned by various heirs.
As we previously stated in McConnico, supra, "a third party dealing with immovable property is charged with knowledge and notice of the existence and contents of a recorded instrument affecting the property. Ignorance of such is culpable." Id. at 196. Where such an instrument contains language that fairly puts a purchaser on inquiry as to the title and he does not avail himself of the means and facilities at hand to obtain knowledge of the true facts he is to be considered as having bought at his own risk and peril. Id., citations omitted.
Louisiana R.S. 3:4278.1 appears to manifest an intent by the legislature to impose a severe penalty (i.e., treble damages) upon those who flagrantly disregard the property rights of timber owners.[5] Allstate, the entity that cut the timber, demonstrated such a flagrant disregard for the property rights of the appellants. Here, Allstate not only had the constructive knowledge of the property's true ownership via the public records, but it also had actual knowledge that the property was owned by various heirs. This knowledge of the property's ownership was coupled with Allstate's knowledge that by law certain precautions must be taken and procedures adhered to when purchasing timber from heirs to original owners (i.e., the 80% rule). Armed with that knowledge, Allstate persisted with its reckless actions. So considering, Allstate, like Moore, was in legal bad faith and is therefore liable as well for treble damages and attorney fees.

Insurance Coverage
In its answer to the appellants' appeal, Continental National raises three assignments of error, all related to the issue of insurance coverage under its policy issued to Allstate. First, it maintains that under the clear language of the policy, coverage would not extend to the actions of Allstate if determined that the occurrence at issue was not an accident. Furthermore, Continental National argues that if Allstate's actions were either intended, or at a minimum, *1205 not expected, such actions were thereby excluded from coverage under the policy. We agree.
An insurance policy is a contract that constitutes the law between the parties. Marcus v. Hanover Ins. Co., Inc., 98-2040 (La.06/04/99), 740 So.2d 603; Pareti v. Sentry Indem. Co., 536 So.2d 417 (La.1988). If the wording of the policy is clear and expresses the intent of the policy, the policy must be enforced as written. Id.
The policy issued to Allstate stated, in pertinent part, as follows:
1. Insuring Agreement.
a. [Continental National] will pay those sums that the insured becomes legally obligated to pay as damages because of ... "property damage" to which this insurance applies.

* * * *
2. This insurance applies to ... "property damage" only if:
a. The ... "property damage" is caused by an "occurrence" that takes place in the "coverage territory";...

* * * *
2. Exclusions.
This insurance does not apply to:
a. Expected or Intended injury
"Bodily injury" or "property damage" expected or intended from the standpoint of the insured....
The policy goes on to define an "occurrence" as "an accident." We note that the policy language is clear and unambiguous.
The very issue of insurance coverage for a claim of wrongful cutting of timber was recently addressed by this court in Pender v. Elmore, 37,690 (La.App.2d Cir.09/24/03), 855 So.2d 930, 935. In that case we reversed the trial court's summary judgment denying insurance coverage due to the subjective nature regarding an insured's expectation as to the scope of its coverage. In Pender, we noted:
Within the context of insurance coverage, the term accident or an equivalent reference to an act or event causing injury which was neither expected nor intended from the standpoint of the insured has been construed by the courts to include not only the insured's negligent conduct, but also intentional conduct as long as the insured did not subjectively expect or intend the resulting injuries or damages.
Id. at 935-36. (Emphasis original).
Furthermore, in Pender, we recognized the Louisiana Supreme Court's pronouncement in Williams v. City of Baton Rouge, 98-1981, 98-2024 (La.04/13/99), 731 So.2d 240, that:
The purpose of the intentional injury provision is "... to prevent an insured from acting wrongfully with the security of knowing that his insurance company will `pay the piper' for the damages." "[N]ot all injuries resulting from an intentional act will be excluded, but only those injuries that were themselves intended." "The subjective intent of the insured, as well as his reasonable expectations as to the scope of his insurance coverage, will determine whether an act is intentional. An act is intended if the perpetrator desires the results of his action or he believes that the results are substantially certain to occur."
Pender, supra at 936.
Here, as we have discussed, Allstate's actions were tantamount to being intentional and, thus, not accidental. Although armed with the actual and constructive knowledge of the property's true ownership, as well as knowledge of the *1206 80% rule, Allstate acted anywayclearly an action which was not an accident, and, thus, not an "occurrence" covered under the policy language. Moreover, Allstate's damages were expected from its own standpoint, and, therefore, excluded under the policy. John Keith, co-owner of Allstate, admitted at trial that he would expect to have a claim against him for unlawful cutting of timber if he failed to obtain the proper permission from the owners for cutting timber. Clearly, Allstate, the insured in this case, knew and expected that such an action against it could occur if it failed to obtain proper authorization for cutting timber, and such an expected incident under the policy is clearly excluded. Therefore, the trial court erred in finding National Continental liable in solido with Moore and Allstate, and that portion of the judgment is hereby reversed. Additionally, our finding makes moot the assignment of error raised by Continental National regarding the coverage issue under the Professional Services Exclusion of the policy.

Damages and Attorney Fees
Having concluded that treble damages should be assessed against Moore and Allstate, we now turn to the calculation of those damages. The parties stipulated as to the value of the trees, that being $58,912.23, which was the amount recognized by the trial court. The amount apportioned to the appellants is $25,248.09 (i.e., 3/7 of the stipulated value), again, an amount recognized by the court. Considering our conclusion regarding the assessment of treble damages, we determine that this is the amount to be tripled, resulting in treble damages of $75,744.27. After taking the amount of restitution already paid by Moore ($21,950.00), we award the appellants $53,794.27.
As to the attorney fees, counsel for appellants seek a contingency fee of one-third of the total amount assessed against Moore and Allstate. Pursuant to La. R.S. 3:4278.1(B) the appellants are entitled to attorney fees, but the statute does not dictate specifically how those fees should be determined, only stating that such fees should be "reasonable." Thus, the fixing of an attorney fee is discretionary with the court. So considering, we instruct the trial court to determine the amount of appellants' attorney fees based on the factors listed in City of Shreveport v. Chanse Gas Corp., 34,958, 34,959 (La. App.2d Cir.08/22/01), 794 So.2d 962, writ denied, 2001-2657, 2001-2660 (La.01/04/02), 805 So.2d 209. Those factors include "... the ultimate result obtained, the responsibility incurred, the importance of the litigation, the amount of money involved, the extent and character of the work performed, legal knowledge, attainment and skill of the attorneys, number of appearances, intricacies of the facts involved, diligence and skill of counsel, and the court's own knowledge." Id. at 978.
Finally, we award the appellants $4,000 for attorney fees incurred in connection with the appeal, in addition to that amount in attorney fees to be awarded by the trial court.

CONCLUSION
For the foregoing reasons, the judgment of the trial court against Benny Moore, individually and d/b/a Piney Wood Timber Company and Allstate Land & Timber Company is affirmed and amended in part and remanded. The judgment as it pertains to Continental National Indemnity Company is reversed. Costs of these proceedings are to be paid one-half by Moore and Allstate and the other one-half by the appellants.
*1207 AFFIRMED AND AMENDED IN PART AND REMANDED; REVERSED IN PART.

APPLICATION FOR REHEARING
Before WILLIAMS, CARAWAY, PEATROSS, DREW, and LOLLEY, JJ.
Rehearing denied.
NOTES
[1] The individual appellants are: Sylvia Cole-Gill, Arthur Cole, Walter Mae Cole Hendry, Dorothy Jean Cole-Grimes, Hattie Cole Simon, Quinton Briggs, Mattie Mae Cole-Toppen, Sylvester Cole, Juanita Cole-Howard, Linda Flem-Buttrill, George Leslie Flem, Anthony Carl Spiller, Myron S. Hopes, Donita Hopes-Abraham, Derrick Hopes, Kawana Hopes-Bowie, Ruth Shepherd-Middleton, Timothy John Shepherd, Elijah Rubins, Jessie Shepherd, Donald Ray Shepherd, CarrLa Jenell Hopes, Rhonda Yvette Hopes-Lewis, Roosevelt Hopes, Jr. and Ronald Bernard Hopes.
[2] Wardie's father and Gladys' husband was Wade Whorton, a son and one of the seven children of Mattie and William Whorton.
[3] The Bill of Information brought by the DeSoto Parish District Attorney against Moore charged him with the offense of timber theft over $500, specifically stating that Moore "committed theft of timber in that he did cut and remove timber in excess of $500.00 without the consent of at least 80% of the co-owners and/or co-heirs representing 80% ownership interest of the timber." The court minutes from the criminal proceedings reflect that Moore, upon hearing the factual basis for his plea, pled guilty to the offense of theft greater than $500.00.
[4] The forged deed was dated January 6, 2000, as was the deed from Piney Wood Timber to Allstate. The forged deed was not recorded until January 7, 2000; thus, it could not have been recorded when presented to Mills.
[5] This was previously noted in Morgan v. Fuller 441 So.2d 290, 296 (La.App. 2d Cir.1983), writs denied, 443 So.2d 596 (La.12/16/83) and 443 So.2d 599 (La.12/16/83) as regarded the predecessor to the current La. R.S. 3:4278.1. Although the statute has been amended since the assertion in Morgan, supra, the intent of the statute clearly remains the same.