STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

04-924


BESSIE L. OTWELL

VERSUS

DIVERSIFIED TIMBER SERVICES, INC., ET AL.


************

APPEAL FROM THE
TWENTY-EIGHTH JUDICIAL DISTRICT COURT,
PARISH OF LASALLE, NO. 32,074,
HONORABLE J. P. MAUFFRAY, JR., DISTRICT JUDGE

************

MICHAEL G. SULLIVAN
JUDGE

************

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and
Michael G. Sullivan, Judges.


AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.


J. Christopher Peters
Attorney at Law
Post Office Box 2387
Jena, Louisiana  71342
(318) 992-7693
        and
Wm. Henry Sanders
Attorney at Law
Post Office Box 1363
Jena, Louisiana  71342
(318) 992-8257

Counsel for Plaintiff/Appellee:  Bessie Otwell, and
        Intervenor/Appellee:  William Henry Sanders

**Robert G. Nida**
**Gold, Weems, Bruser, Sues & Rundell**
**2001 MacArthur Drive**
**Alexandria, Louisiana  71307**
**(318) 445-6471**
**Counsel for Defendants/Appellants:**
      **Jesse V. Moffett, Jr.**
      **B & S Timber, Inc.**
      **David Barker**
      **Kenny Barker**

SULLIVAN, Judge.

Defendants, Jesse Moffett, Jr., B & S Timber, Inc., David Barker, and Kenny Barker, appeal a judgment awarding treble damages for timber trespass and general damages to Plaintiff, Bessie Otwell Sanders, and general damages to Intervenor, William Henry Sanders. For the following reasons, we affirm in part, reverse in part, and render.

## Factual and Procedural Background

This timber trespass suit involves a disputed 3.12-acre tract of land in LaSalle Parish, Louisiana. On February 22, 2001, Mr. Moffett sold the timber on the disputed tract to B & S Timber, which then contracted with David and Kenny Barker to cut and haul the timber. At the time of the sale, Mr. Moffett considered himself to be the record owner of the disputed property, believing that it was contained within a 16-acre tract that he acquired from E. E. Jones on August 27, 1955.

On April 9, 2001, Mrs. Sanders filed the present suit in which her husband, Mr. Sanders, subsequently intervened as a Plaintiff. Mrs. Sanders alleged that, on September 22, 1967, she acquired a right of use and habitation from her grandfather, Terry Brown, over twenty-four acres known as the "Terry Brown Estate," which included the disputed property, and that, on January 8, 1968, she acquired title from her grandfather to a portion of that estate. She also pled ownership through ten and thirty years acquisitive prescription. Mr. Sanders' intervention is based upon a right of use and habitation granted by Mrs. Sanders' mother, Margaret Otwell, to both Mr. and Mrs. Sanders on May 10, 1968, over "[a]ll that property commonly known as the Terry Brown Estate." In a prior unpublished opinion involving a possessory action between Mrs. Sanders and Mr. Moffett, this court affirmed the trial court's determination that Mrs. Sanders was in possession of the disputed property. *Otwell*

*v. Moffett*, 02-731 (La.App. 3 Cir. 11/13/02), 836 So.2d 705, *writ denied*, 03-434 (La. 4/21/03), 841 So.2d 806.

The "Terry Brown Estate" was once part of the Charles McBride Riquet No. 39, a government land grant of 643 acres made on March 3, 1807. In the grant, the eastern boundary of the Charles McBride Riquet was described as "the waters of [the east prong of] Hemphill's Creek." The eastern boundary of the riquet was eventually designated as the boundary between Section 39 and Section 24 of Township 8 North, Range 3 East. Mr. and Mrs. Sanders contend that, sometime in the 1930's, the government straightened out a curve in the east prong of the creek, moving the bed to the west of its original path, but that the boundary between Section 39 and Section 24 did not change. The disputed property lies between the present location of the creek and the "old slough," a natural monument believed to be the ancient creek bed. Mr. Moffett's 1955 deed describes the western boundary of his 16-acre tract as the "East line of the Charles McBride Riquet No. 39," which he contends is the present location of the creek.[1]

After a bench trial, the trial court found that Mr. and Mrs. Sanders failed to prove record or just title to the disputed acreage because they did not establish when or how the creek bed was altered, *i.e.*, they did not prove that "the waters of Hemphill Creek" flowed through the "old slough" at the time of the government land grant in 1807. However, the trial court did find that Plaintiffs proved title to the property

---

[1]In yet another action between these parties, a boundary dispute, this court reversed summary judgment in favor of Mr. and Mrs. Sanders, finding that a genuine issue of material fact existed as to whether Hemphill Creek was navigable at the time the boundary between Sections 34 and 29 was set by the official government survey in 1883. *Sanders v. Moffett*, 03-231 (La.App. 3 Cir. 10/1/03), 856 So.2d 1244. At the conclusion of the present case, the trial court issued a ruling stating: "At trial it was clear that the East fork of Hemp's Creek, no matter where i[t] was located at any time, was never navigable at any time pertinent to the resolution of this suit or any other suit between these parties."

through thirty years acquisitive prescription. The trial court then awarded Mrs. Sanders, as owner of the disputed property, treble damages for timber trespass under La.R.S. 3:4278.1(C), totaling $40,431.15, and general damages of $1,800.00, and awarded Mr. Sanders general damages of $4,200.00 for interference with his right of use. After receiving post-trial briefs, the trial court then set expert witness fees of $20,321.50 for Plaintiffs' surveyor, $800.00 for Plaintiffs' forester, and $900.00 for Defendants' surveyor.

## Acquisitive Prescription

In their first assignment of error, Defendants argue that the trial court erred in finding sufficient corporeal possession to establish ownership by thirty years acquisitive prescription.

Ownership of immovable property may be acquired by the prescription of thirty years without the need of just title or possession in good faith. La.Civ.Code art. 3486. Corporeal possession sufficient to confer prescriptive title must be continuous, uninterrupted, peaceable, public, and unequivocal. La.Civ.Code art. 3476. "For purposes of acquisitive prescription without title, possession extends only to that which has been actually possessed." La.Civ.Code art. 3487. "Actual possession must be either inch-by-inch possession . . . or possession within enclosures. According to well-settled Louisiana jurisprudence, an enclosure is any natural or artificial boundary." La.Civ.Code art. 3426, comment (d).

As the supreme court explained in *Liner v. Louisiana Land & Exploration Co.*, 319 So.2d 766, 772 (La.1975), "[t]he concept of possession is neither simple nor precise." Thus, "the corporeal possession requisite in the case of agricultural land should not be the same as that in the case of wood land or swamp land. . . ." *Id.*

3

"Whether a party has possessed property for purposes of thirty-year acquisitive prescription is a factual determination by the trial court and will not be disturbed on appeal unless it is clearly wrong." *Secret Cove, LLC v. Thomas*, 02-2498, p. 6 (La.App. 1 Cir. 11/7/03), 862 So.2d 1010, 1016, *writ denied*, 04-447 (La. 4/2/04), 869 So.2d 889.

Mr. Sanders testified that his wife acquired title from her grandfather to the land between the present channel and the old slough and that he began timber management on this property, as well as on other lands, at her request. It is undisputed that sometime in 1967, Mr. Sanders began marking trees on the perimeter and throughout the disputed property, some of which were inscribed with his wife's registered brand, the initials "BO" over a half-moon. Other trees were inscribed with the initials "CM," designating those trees that Mr. Sanders set aside for another individual, Chris Moss. Mr. Sanders explained that he "hacked trees for a long period of time" so that "anyone passing through there [would] know that this land was occupied by somebody" and that he wanted to let anyone "without knowledge of the boundary [to] know that this property was occupied by . . . someone with apparent brand or someone with initials." He testified that, in no uncertain terms, he told Mr. Moffett that the boundary between their lands was the old creek bed, around which he found old generations of fencing, even though the land was not fenced recently. In addition to marking trees, Mr. Sanders ran off trespassers, cut an existing fence to make a riding trail, shot hogs, hunted wood ducks, and harvested berries. He testified that he placed the property in a hunting club that posted signs and erected deer stands. He also took an interest in the property as "heritage property," searching for Indian artifacts and investigating old sites such as a mill believed to have been

4

burned during the Civil War. According to Mr. Sanders, he has never been "run off" the property, and the only evidence of another's possession occurred when his original markings on the trees were painted over with blue-green paint. He then hired someone to apply red paint over the blue-green paint. Charles Moffett, the son of Mr. Jesse Moffett, testified that the painting over Mr. Sanders' markings would have occurred between his retirement in 1999 and the cutting of the timber in 2001.

In commenting on the number and frequency the trees marked, the trial court stated: "I find as a fact that it was many, many trees. If it was 200 trees that wouldn't be . . . an underestimate of how many trees had marks on 'em. And with that many marks on that many trees on that small a piece of land, you knew that somebody was laying claim to it." The trial court's finding regarding the number of trees marked is supported, in part, by the testimony of Mr. Moffett, who stated that there was "paint on everything," not only by the borders but also "everywhere else." Considering the number of trees involved and Mr. Sanders' other activities on the property, we find the case cited by Defendants, *Albert Hanson Lumber Co. v. Baldwin Lumber Co.,* 126 La. 347, 52 So. 537 (1910), is distinguishable, where the party claiming possession marked only on the four corners of the property.

**Treble Damages**

In their second assignment of error, Defendants argue that the trial court erred in awarding treble damages under La.R.S. 3:4278.1(C), even though the trial court stated that Mr. Moffett was in "good faith" when he contracted for the cutting of the timber.

Louisiana Revised Statutes 3:4278.1 (emphasis added) provides in part:

> A. It shall be unlawful for any person to cut, fell, destroy, remove, or to divert for sale or use, any trees, or to authorize or direct

5

his agent or employee to cut, fell, destroy, remove, or to divert for sale or use, any trees, growing or lying on the land of another, without the consent of, or in accordance with the direction of, the owner or legal possessor, or in accordance with specific terms of a legal contract or agreement.

B. Whoever willfully and intentionally violates the provisions of Subsection A shall be liable to the owner or legal possessor of the trees for civil damages in the amount of three times the fair market value of the trees cut, felled, destroyed, removed, or diverted, plus reasonable attorney's fees.

C. Whoever violates the provisions of Subsection A *in good faith* shall be liable to the owner or legal possessor of the trees *for three times the fair market value* of the trees cut, felled, destroyed, removed, or diverted, *if circumstances prove that the violator should have been aware that his actions were without the consent or direction of the owner or legal possessor of the trees.*

D. If a good faith violator of Subsection A fails to make payment under the requirements of this Section within thirty days after notification and demand by the owner or legal possessor, the violator shall also be responsible for the reasonable attorney fees of the owner or legal possessor.

In the present case, Mr. Moffett testified that he knew as early as 1966 that Mr. and Mrs. Sanders intended to claim the property east of the present creek bed, based upon a conversation that he had with Mrs. Sanders' father, John Otwell. Although he believed that his title extended to the present creek bed, he also knew how long Mr. Sanders had been marking trees on the property. Additionally, Mr. Moffett recalled informing the owner of B & S Timber, Ronnie Jameson, that there would be a controversy about the cutting of the timber. Based upon this record, we cannot conclude that the trial court erred in awarding treble damages under La.R.S. 3:4278.1(C).

**Mr. Sanders' General Damages**

In their third assignment of error, Defendants argue that the trial court erred in awarding general damages to Mr. Sanders , who was neither an owner of the property

6

nor one possessing for himself. In awarding general damages, however, the trial court found that Mr. Sanders perfected a right of use over the disputed property through acquisitive prescription. Mr. Sanders' claim was based on the 1968 document granting him and his wife a right of use and habitation over "[a]ll that property commonly known as the Terry Brown Estate." Although the trial court concluded that this document did not establish just title over the disputed property, the trial court found that Mr. Sanders believed that the Terry Brown Estate extended to the "old slough" and that he exercised his right of use over that property.

The right of use is defined as a personal servitude that "confers in favor of a person a specified use of an estate." La.Civ.Code art. 639. Under La.Civ.Code art. 645, the right of use "is regulated by application of the rules governing usufruct and predial servitudes to the extent that their application is compatible with the rules governing right of use." As noted in comment (b) to La.Civ.Code art. 3446, acquisitive prescription applies to real rights such as usufruct and apparent servitudes. Comment (c) to La.Civ.Code art. 544 also states acquisitive prescription is an additional method for the creation of usufruct. Based upon the above, we do not find that the trial court erred in awarding Mr. Sanders general damages for interference with his right of use over the disputed property.

**Value of the Timber**

In their fourth assignment of error Defendants argue that the trial court erred in basing its award of damages on the price at the mill for the harvested timber rather than on the fair market value of the timber as provided in La.R.S. 3:4278.1(C).

Plaintiffs' forestry expert, F. L. Johnson, testified that the timber removed from the property had a value of $13,477.05. Mr. Johnson also acknowledged, however,

7

that the landowner would not receive that amount from the mill because his calculations did not include deductions for logging costs, which could vary greatly. Defendants introduced documentation showing that B & S Timber received $11,017.57 in payments from three mills, from which Mr. Moffett was paid $5,340.32.

In accepting Mr. Johnson's figure as the measure of damages under La.R.S. 3:4278.1, the trial court relied on *Carroll v. International Paper Co.*, 94-302, p. 7 (La.App. 3 Cir. 11/2/94), 649 So.2d 474, 478, *writ denied*, 94-2924 (La. 2/17/95), 650 So.2d 259, in which this court, in quoting the trial court's reasons, stated:

> The defendant argues that plaintiffs' loss is stumpage value. Such a calculation does not compensate the plaintiffs for their loss. Not only have they lost the standing timber, but they have lost their right to determine the timing and conditions of sale of their own property. Given the current value of standing timber, this is a substantial loss. Additionally, they have lost the opportunity to enjoy their property in its prior state, and that loss cannot be replaced in the near future. Although INTERNATIONAL PAPER COMPANY was not in bad faith, a mistake of this magnitude requires the application of treble damages. Based upon the evidence presented, the market value of the timber taken is $38,988.11.

This court in *Carroll*, however, did not define "fair market value" as provided in La.R.S. 3:4278.1(C) and did not elaborate on the calculation of the value ultimately accepted. The second circuit in *McConnico v. Red Oak Timber Co.*, 36,985, p. 11 (La.App. 2 Cir. 5/16/03), 847 So.2d 191, 198 (emphasis added), after a detailed discussion of La.R.S. 3:4278.1 and the law prior to its enactment, determined that "fair market value"as provided therein "refers to the amount *a purchaser would pay for standing timber to be cut and removed*."[2]

---

[2]*See also Cole-Gill v. Moore*, 37,976 (La.App. 2 Cir. 12/19/03), 862 So.2d 1197, *writ denied*, 04-446 (La. 4/30/04), 872 So.2d 501, in which the parties stipulated that the value of the timber was equal to the revenue earned by the timber cutter less the costs of hauling and cutting.

As explained in *McConnico*, prior to 1974, the jurisprudence established that the measure of damages owed by a timber trespasser depended upon his moral culpability: a trespasser guilty of "moral bad faith" was liable for the "converted value" of the timber without deductions for costs and expenses; one guilty of "legal bad faith" was allowed to deduct his actual expenses in converting timber to lumber in assessing damages; and a trespasser in "good faith" was only liable for "stumpage value." With the enactment of the timber trespass statute in 1974 (originally designated as La.R.S. 15:1478.1), the legislature retained the degrees of culpability, but fixed a single measure of damages for one in moral or legal bad faith as three times the "fair market value" of the of the trees cut, felled, destroyed, removed, or diverted, a term that had not been used in the prior jurisprudence. (The legislature also added attorney fees as a penalty for one in moral bad faith.) Given that the statute introduced the additional penalties of treble damages and attorney fees in certain instances, we agree with the *McConnico* court's interpretation of the term "fair market value." Accordingly, we find that the trial court erred in not considering the costs of logging and hauling in setting the fair market value of the timber removed.[3] The only evidence of such costs is that provided by Defendants, which is the difference between what the mills paid B & S Timber and what Mr. Moffett received, or $5,677.25. Deducting this amount from the mill value of the timber as fixed by the trial court, $13,477.05, we find the fair market value of the timber cut to be

---

[3]The impact of this statutory scheme is illustrated as follows. Under the jurisprudence before 1974, Mr. Moffett would have been in legal bad faith, *i.e.*, one who believed himself to be the owner of the timber but who should have known otherwise. Under those circumstances, his liability would have been reduced by the *actual* expenses of converting the timber. Given the figures that he introduced as to mill payments and expenses, his liability under the prior law would have been limited to $5,340.32. Under our interpretation of the present statute, as one who is in good faith but who should have been aware of certain circumstances, Mr. Moffett is liable for over three times that amount for the same conduct.

$7,799.80. Accordingly, Mr. Moffett is liable to Mrs. Sanders for three times $7,799.80, or $23,399.40, under La.R.S. 3:4278.1(C). Because Defendants have not contested the amount of general damages awarded to Mrs. Sanders, that award is not disturbed.

## Expert Fees

In their final assignment of error, Defendants argue that the trial court erred in fixing the expert witness fees for Plaintiffs' surveyor, Mark Tooke, at $20,321.50, contending that Mr. Tooke's bills included worked performed on other cases involving the disputed property, that his work was cumulative of lay testimony, and that the trial court largely ignored his findings.

Louisiana Revised Statutes 13:3666(A) provides:

> Witnesses called to testify in court only to an opinion founded on special study or experience in any branch of science, or to make scientific or professional examinations, and to state the results thereof, shall receive additional compensation, to be fixed by the court, with reference to the value of time employed and the degree of learning or skill required.

In *McKoin v. Harper*, 37,984, pp. 3-4 (La.App. 2 Cir. 12/10/03), 862 So.2d 410, 412-13 (citations omitted), the court explained:[4]

> Witnesses called to testify as expert witnesses shall be compensated for their services, with the amount to be determined by the court and taxed as costs to be paid by the party cast in judgment. An expert witness is entitled to reasonable compensation for his court appearance and for his preparatory work. The trial judge is not required to set an expert fee at the amount charged by the expert witness and has great discretion in awarding and fixing costs and expert fees. However, a trial court's assessment of costs can be reversed by an appellate court upon a showing of abuse of discretion.

---

[4]In *McKoin*, the appellate court found that the trial court erred in not awarding the successful plaintiffs in a boundary action their total surveying costs, thereby raising the expert fees from $60.000.00 to $81,231.20.

Factors to be considered by the trial judge in setting an expert witness fee include time spent testifying, time spent in preparatory work for trial, time spent away from regular duties while waiting to testify, the extent and nature of the work performed, and the knowledge, attainments and skill of the expert. Additional considerations include helpfulness of the expert's report and testimony to the trial court, the amount in controversy, the complexity of the problem addressed by the expert, and awards to experts in similar cases.

In setting Mr. Tooke's fee, the trial court stated in its reasons for judgment:

[Mr. Tooke's] knowledge, skill, experience, training and education permitted him to provide the trier of fat with assistance in understanding the physical evidence and determining several facts in issue in this case. Not only did Mr. Tooke furnish several plats and diagrams which were helpful to the court, but he was also able to explain to the trier of fact the art and science of surveying and the precepts, rules and other techniques used by surveyors in the past and present to establish the confines of estates on the ground.

In reviewing Mr. Tooke's total statements of $24,646.50, the trial court found that $7,346.50 was attributable solely to work performed in this case. Concerning the remaining invoices, the trial court determined that seventy-five percent of the remaining work related to issues in the present suit, although the work may have been performed in all four suits concerning the subject property. From the trial court's remarks, it is clear that the trial court relied on Mr. Tooke's testimony to better understand the art of surveying. The trial court also relied on Mr. Tooke's plats in fixing the boundary in the judgment of possession attached to the judgment issued in this suit. We find no abuse of discretion in the fixing of expert witness fees.

**Decree**

For the above reasons, the judgment of the trial court is reversed in part to reduce the treble damages payable to Mrs. Sanders under La.R.S. 3:4278.1(C) to $23,399.40. In all other respects the judgment is affirmed. Costs of this appeal are assessed two-thirds to Defendants and one-third to Plaintiffs.

**AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.**