# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 17-666

**LINDA MOUTON, ET AL**

**VERSUS**

**AAA COOPER TRANSPORTATION, ET AL.**

**CONSOLIDATED WITH:**

## 17-667

**CORY MOUTON**

**VERSUS**

**AAA COOPER TRANSPORTATION, ET AL.**

**\*\*\*\*\*\*\*\*\*\*\*\***
APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 2015-0463 C/W 2015-0466, DIV. F
HONORABLE DAVID M. SMITH, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\*\*\***
**SYLVIA R. COOKS**
**JUDGE**
**\*\*\*\*\*\*\*\*\*\*\*\***

Court composed of Sylvia R. Cooks, Phyllis M. Keaty, and Van H. Kyzar, Judges.

**AFFIRMED.**

Derrick Earles
David C. Laborde
Jeff D. Easley
Laborde Earles Law Firm, LLC
603 N. Washington St.
Marksville, LA 71351
COUNSEL FOR PLAINTIFFS/APPELLEES:
    Linda Mouton and Cory Mouton


S. Daniel Meeks
Nicholas J. Lorusso

**Phyllis E. Glazer**
**Kristen E. Meeks**
**Meeks & Associates, L.L.C.**
**3401 West Esplanade Ave., South, Suite 3**
**Metairie, LA 70002**
**(504) 355-0020**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
　　**Arthur Huguley, AAA Cooper Transportation, Inc. and ACE American Ins. Co.**

**COOKS, Judge.**

## FACTS AND PROCEDURAL HISTORY

This appeal arises out of a tragic accident which occurred on April 24, 2014, on Interstate 10, in Lafayette Parish. On that date, Arthur Huguley was operating a tractor-trailer rig in the course and scope of his employment with AAA Cooper Transportation, Inc. (AAA Cooper). The decedent, Curley Mouton, was driving in his Mack truck behind the AAA Cooper tractor-trailer.

While driving his tractor-trailer eastbound on Interstate 10, between mile markers 96 and 97, Mr. Huguley testified he heard a "loud bang." Mr. Huguley continued driving on the interstate for approximately two miles after hearing the "loud bang." Fearing he might have a tire blowout, Mr. Huguley decided to engage in a "wiggle" maneuver. This maneuver is accomplished by intentionally swaying the trailer back and forth, which allows the driver to see his trailer tires in his side view mirrors to determine if he suffered a blowout. Mr. Huguley chose to perform this "wiggle" maneuver rather than pulling onto the shoulder and getting out and inspecting his tires. When the "wiggle" maneuver was initiated, this apparently caused the blown out tire to rapidly come apart, which resulted in pieces of the tire flying into the air. Mr. Huguley later testified he recognized his back trailer tire had blown, because he saw tire debris flying in the air behind his rig.

Mr. Mouton was traveling behind the tractor-trailer as the debris began flying through the air. Shortly thereafter, the Mack truck being driven by Mr. Mouton left its lane of travel, struck and traveled through a guardrail on Interstate 10, flipped over, hit a tree, and landed upside down in a drainage ditch. Mr. Mouton died as a result of the crash.

Plaintiffs, Linda Mouton (the surviving spouse of the decedent) and Cory Mouton (the major son of the decedent) filed separate wrongful death and survival

actions against Defendants, Arthur Huguley, AAA Cooper, and Ace American Insurance Company (Ace). The suits were consolidated by the trial court.

Following a trial by jury, a verdict was returned in favor of Plaintiffs. The jury apportioned ten percent (10%) fault to Mr. Huguley and ninety percent (90%) fault to AAA Cooper for placing a defective tire on its tractor-trailer. Curley Mouton was found to be free from fault. The jury awarded damages in the following amounts:

**Survival Action Damages**

| | |
|---|---|
| Conscious Pain and Suffering, Mental and Physical | $ 50,000.00 |
| Past Medical Expenses | $ 1,213.55 |
| Funeral Expense | $ 16,488.67 |

**Wrongful Death Damages (sustained by Linda Mouton)**

| | |
|---|---|
| Loss of Financial Support | $100,000.00 |
| Loss of Services | $ 10,000.00 |
| Loss of Love and Affection | $150,000.00 |
| Past and Future Mental Anguish, Grief and Anxiety | $150,000.00 |

**Wrongful Death Damages (sustained by Cory Mouton)**

| | |
|---|---|
| Loss of Services | $ 10,000.00 |
| Loss of Love and Affection | $ 75,000.00 |
| Past and Future Mental Anguish, Grief and Anxiety | $ 75,000.00 |

In response to the jury verdict, Mr. Huguley and AAA Cooper separately filed Motions for Judgment Notwithstanding the Verdict (JNOV) and Motions for New Trial on Liability. The trial court denied these motions. Plaintiffs filed their own JNOV, seeking an increase in the survival action general damage award. The trial court granted the motion and increased the award for general damages in the survival action from $50,000.00 to $150,000.00. Costs were also taxed. In total, after the granting of the JNOV, the amount of damages awarded to both Plaintiffs was $737,702.52, plus court costs.

On February 8, 2017, the trial court signed a judgment which taxed costs for expert fees and increased the survival action general damage award to $150,000.00. On March 1, 2017, Defendants filed a motion for suspensive appeal, obtained a signed order of appeal, and posted an appeal bond. The record was

lodged in this court and briefs were filed. On review, this court determined the February 8, 2017, Final Judgment did not contain proper decretal language, including the names of the parties against whom judgment was rendered (with a specification of the percentages of fault as assessed by the jury) and a specification of the increase in the award of general damages in the survival action and other damages awarded by the jury. This court then issued a rule ordering Defendants to show cause, by brief only, why their appeal should not be dismissed as having been taken from the February 8, 2017 judgment that lacked proper decretal language, or, in the alternative, why the appeal should not be suspended pending the receipt of a judgment containing proper decretal language.

On January 10, 2018, this court issued a ruling suspending the appeal and remanding the matter to the trial court with instructions to issue a judgment containing proper decretal language. Following remand and the issuance of a final judgment with proper decretal language, this consolidated appeal was lodged.

In their appeal, Defendants have asserted the following assignments of error, which are summarized below:

1. The jury erred in assessing no fault to Mr. Mouton.

2. The jury erred in assessing ten percent (10%) fault to Mr. Huguley.

3. The trial court erred in allowing Plaintiffs to argue various theories of how the accident occurred without supporting evidence.

4. The trial court erred by allowing Mr. Gillen to testify as an expert in the "rules of the road" governing commercial truck drivers.

5. The testimony of Mr. Gillen was so prejudicial that the appellate court should conduct a de novo review of the jury's findings of fact.

6. The trial court committed legal error when it allowed the Plaintiffs to argue to the jury that AAA Cooper was liable under La.Civ.Code arts. 2317 and 2317.1.

7. The Plaintiffs failed to plead a cause of action upon which relief could be granted against AAA Cooper under La.Civ.Code arts. 2317 and 2317.1, and therefore, that cause of action should not have been argued to the jury or included in the jury instructions.

5

8. The jury committed manifest error by apportioning any fault directly to AAA Cooper under La.Civ.Code arts. 2317 and 2317.1 when the Plaintiffs failed to prove every essential element of that claim.

9. The trial court erred in disregarding the jury's vast discretion and granting the JNOV increasing the award of general damages in the survival action; and, in the alternative, the award was abusively high and should be reduced.

10. The trial court erred by awarding certain fees to Plaintiffs for Mr. Gillen's services.

## ANALYSIS

## I.   *The Jury's Findings of Fault.*

Several of Defendants' assignments of errors contend the jury erred in its apportionment of fault. The appellate standard of review when examining a jury's findings of fault are well settled. An appellate court must give the jury's apportionment of fault great deference on review and must affirm that apportionment of fault unless it is manifestly erroneous or clearly wrong. *Dupree v. City of New Orleans*, 99-3651 (La. 8/31/00), 765 So.2d 1002. Thus, we review the facts of the case only to determine if the jury's fault assessments were manifestly erroneous. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous. *Stobart v. State, Dep't of Transp. and Dev.*, 617 So.2d 880 (La.1993). Further, where the findings are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the findings of fact. *Rosell v. ESCO*, 549 So.2d 840 (La.1989).

## a.   *Fault of Curley Mouton.*

Defendants first argue the jury erred in finding Curley Mouton free from fault in causing the accident. On review, we find the jury's determination that Mr. Mouton was free from fault was reasonable based on the evidence presented at trial.

6

Todd Dauphinet, who was driving behind both Mr. Huguley's tractor-trailer and Mr. Mouton's truck when the accident happened, witnessed the accident, and gave the following statement at the scene:

> There was a 18-wheeler with a trailer in the left lane and a TK Stanley truck [Mr. Mouton's vehicle] was behind them. The front truck blew a tire going into the right lane together. But she[1] [Mr. Mouton] had no room to go and was pushed over to the right lane. Last I seen truck was in the air.

In his testimony, Mr. Dauphinet expressed his opinion that Mr. Mouton did nothing wrong in his driving. He stated he was approximately "three vehicles behind" Mr. Mouton's truck. He testified at the time Mr. Mouton's vehicle left the road, the air was full of thick, white smoke and he "could see [Mr. Mouton's] truck veering to the right towards the center line and then it worked back to the left side and then all of a sudden it took an immediate right and it just hit the hand rail."

Susie Wilridge was driving her vehicle behind Mr. Mouton's truck at the time of the accident, and testified she saw "smoke and debris, tire debris." She stated the debris "was coming at me." Ms. Wilridge further testified as follows concerning the events immediately precipitating Mr. Mouton's vehicle leaving the road:

> Q. What about the Mouton vehicle? Did you see whether it braked or not?
>
> A. It broke hard and then moved suddenly to the right. And then moved over like he was trying to get out of the way. Because the 18-wheeler was right there within a car or two lengths.
>
> Q. Did you say you saw some smoke as well?
>
> A. Yes, I did.
>
> Q. This debris that you saw on the roadway, rolling towards to you, how big was the debris?
>
> A. As large as approximately two feet and then variable sizes.

---

[1] Mr. Dauphinet testified he originally thought Mr. Mouton was a she, because when he got to the scene the body was so badly mangled he could not tell whether it was a man or woman, and Mr. Mouton's voice at that time was very high pitched.

Q. Was there a lot of it?

A. Yes.

Q. What did the Mouton vehicle do then?

A. I don't know at that time. I just saw it veered off and hit the railing and flip because I was driving, I broke hard, saw what was going on, looked and just kept trying to remain in control of my vehicle.

. . . .

Q. How would you describe his departure from the roadway?

A. I would say it was fast. It wasn't like immediately but he was moving over like trying to get out of the way of hitting someone.

Q. What did you see the Mouton vehicle do once it left the roadway? Or did you see it?

A. All I saw was he hit the guard rail and then it was moving - - flipped over. I couldn't look anymore than that because I had to look where I was going.

Valerie Wilridge was riding with her mother and testified she found "nothing out of the ordinary" with Mr. Mouton's driving. She stated as follows:

A. We were driving behind him [Mr. Mouton].

Q. Okay. At any time was he driving erratically or speeding?

A. No.

Q. Was he driving normal?

A. Yes. We were driving just below the speed limit.

Q. Okay. How do you remember that?

A. I remember that because the traffic was very heavy. So no one was really able to go the speed limit.

As Plaintiffs note, even the testimony of Mr. Huguley indicates Mr. Mouton was driving safely and within the posted speed limit:

Q. Mr. Huguley, you saw Mr. Mouton driving for several minutes at various times before this accident, correct?

A. One time when I passed him, when I was coming up on him to pass him.

Q. You also saw him another time in the mirror?

A. Correct.

Q. One or two times?

A. Well, two or three times.

Q. Over a period of a couple of miles, you think?

A. Correct.

Q. Every time you saw him you were driving faster than he was, correct?

A. Correct.

Q. In fact, you were passing him.

A. Correct.

Q. You never saw him drive recklessly?

A. No.

Q. You never thought he was speeding?

A. Correct.

Q. You never saw him drive erratically; is that correct?

A. Correct.

Defendants contend there was no explanation offered at trial as to why Mr. Mouton lost control of his vehicle. Obviously, Mr. Mouton was unable to testify as to why he lost control of his vehicle. However, the testimony was clear that Mr. Mouton was operating his vehicle in a safe and careful manner, and suddenly veered off the road as white smoke and tire debris flew out from the AAA Cooper tractor-trailer. Thus, we cannot say the jury manifestly erred in determining Mr. Mouton was not at fault in causing the accident.

*b. Fault of Arthur Huguley.*

Defendants next contend the jury erred in assessing ten percent (10%) fault to Mr. Huguley. At trial, Mr. Huguley testified as follows concerning the sequence of events just prior to the accident:

> Q. As you were passing Mr. Mouton and the two other vehicles you heard a loud bang, didn't you?
>
> A. Correct.
>
> Q. As a truck driver, you thought that was a tire.
>
> A. It sound like a tire but it didn't sound like a tire but it sound like a tire.
>
> Q. So, it sounded like a tire but it didn't sound like a tire?
>
> A. Right.
>
> Q. But being the driver that you are, you knew it was a tire.
>
> A. No. It's like I say, it sound like a tire and it didn't sound like a tire. It sounded like it was on the westbound side. So once I check my left mirror to see what was going on on the westbound side, I didn't see anything.
>
> Q. What did you do next?
>
> A. What I did – I, uh, realized, well, if it's not on the westbound side, it's a possibility it could have been my tire. So I did a maneuver, what I call and a lot of more truckers call, "a wobble."
>
> Q. Wobble?
>
> A. Yes.

Mr. Huguley then explained to the jury what a "wobble" or "wiggle" maneuver is for:

> Q. And the purpose of this technique is if you suspect you have a flat tire, rather than have to pull over and get out and check your tire, you can wiggle the trailer, correct?
>
> A. Correct.
>
> Q. And when you wiggle the trailer, if you have a flat tire, that wiggle makes debris fly off the tire, doesn't it?
>
> A. Not necessarily.

Q. If you have a flat tire, most of the time a wiggle makes debris fly off the tire, doesn't it?

A. The debris gonna come off the tire anyway. The wiggle is to check it to make sure it's your tire.

. . .

Q. With respect to a flat tire, this wiggle allows you check to see if you have a flat tire?

A. Not really. What it – what it does is, well, what it does is you gradually turn the steering wheel to the left and it offset the trailer so you can see anything coming off. You gradually pull it back to the right just a little bit to see if anything is coming off your trailer. So, by me doing that, that let me know that it was my tire.

. . .

Q. If you have a flat, usually – "usually" you can see debris flying off the tire.

A. Correct.

Mr. Huguley's testimony established, as he was passing Mr. Mouton around mile marker 96 or 97, he heard a loud bang and realized he may have suffered a tire blow out. Rather than pulling to the shoulder of the interstate and checking his tires, he continued driving for another two miles. He then decided to attempt a "wiggle/wobble maneuver" to help determine if he indeed suffered a tire blow out. By all testimony, this then caused his tire to rapidly disintegrate, causing debris to fly through the air. Valerie Wilridge stated there were pieces of tire "everywhere," and that her mother broke hard and had to swerve to avoid the debris. She further testified tire debris would likely have struck the Wilridge vehicle, but it was striking Mr. Mouton's truck in front of them.

At trial, Mr. Huguley acknowledged the Commercial Driver's Manual instructs a driver, if he believes he may have suffered a tire blow out, to immediately pull off the road and check the tires, "even if the vehicle seems to be handling all right." He testified:

Q. You just heard a loud bang or pop or whatever it was. You didn't pull over like the bible [the Commercial Driver's License Manual] says you should do, right?

A. Correct.

Q. What did you do next?

A. I did what they call – that I call a wiggle.

Thus, Mr. Huguley's own testimony confirms, rather than following the Commercial Driver's License Manual, he decided to employ the "wobble/wiggle" technique, which caused a large amount of tire debris to fly through the air at Mr. Mouton's vehicle. Mr. Gillen, Plaintiff's accident reconstructionist, testified that the departure angle Mr. Mouton's truck made in leaving the road indicated "a very extreme departure consistent with a sudden evasive maneuver by the driver." Mr. Gillen further testified:

Q. Do you have an opinion as to whether or not that was a reasonable action for [Mr. Huguley] to continue driving down the highway?

A. I am of the opinion that that was not a reasonable action.

Q. Why was that?

A. For a professional truck driver or any driver to continue traveling down the interstate at an interstate speed suspecting that you may have possibly have experienced a blowout. I think that the safer option was what the commercial driver's license manual outlines and what your regular driver's license manual outlines. Reduce your speed; hold on to the steering wheel to maintain steerage; move over to the right and stop out of the roadway to check your tires.

Q. And in your experience as an expert in the field of accident reconstruction and rules of the road, that someone would have an ample opportunity to do that in the three mile span on an interstate highway with what Mr. Huguley characterized as light traffic ahead of him?

A. Yes, sir. I think they had. Had he simply adjusted his speed, he could have reduced his speed to accommodate the traffic that he says was to his right. Let that traffic clear. Then move over to the right. Pull onto the shoulder. This is a straight long section of interstate with a ten foot wide paved shoulder wide enough to accommodate his eight foot wide truck. He ultimately pulled over to the shoulder and was clear of the roadway. But he had a three mile opportunity to do that prior to where he ultimately stopped.

12

Q. He also had an exit to do it, didn't he?

A. Yes, sir. He did. He went past the Scott exit.

Q. Mr. Gillen, what about the wiggle of his truck? You heard him testify about that?

A. I did. Yes, sir.

Q. Do you have an opinion as to whether or not a professional truck driver who suspects that they have a flat tire should wiggle a truck and trailer while traveling 67 miles an hour down the interstate highway?

A. I am of the opinion that that is a completely unsafe maneuver. You're creating an instability with that trailer, which Mr. Huguley has acknowledged he was carrying a 44,000 pound load. To put that in perspective a Suburban, pretty big vehicle, weighs about 5,000. So he's got the equivalent of nearly nine Suburbans loaded in his trailer and he is testifying that he's going to wiggle that so he can get a better view of the tire rather than pull over and check on the shoulder. I have never seen that advocated in any driving manual. I have never heard of a truck driver doing that. And, again, I don't think that was a safe maneuver at all.

After a review of the above testimony of the witnesses and experts, it is apparent the jury's finding of fault on the part of Mr. Huguley cannot be said to be manifestly erroneous.

c. *Fault of AAA Cooper.*

AAA Cooper was found at fault by the jury because it found the failed tire which led to the accident was defective. As Plaintiffs note, the following stipulation concerning the failed tire occurred at trial:

THE COURT: Do you have a stipulation in reference to the plugs and patches?

MR. LABORDE (Counsel for Plaintiffs): We have a stipulation regarding the retread tire. Your Honor, there was a conference among counsel and the Court just before our recess. And in light of defendant's [sic] not calling Keith Rombard, it is my understanding that defense counsel is willing to stipulate that the tire that blew out in this accident has been recapped or retreaded three times.

MR. MEEKS (Counsel for Defendants): And that is in Mr. Gillen's report.

MR. LABORDE: And that it had been plugged twice and patched twice before this accident.

MR. MEEKS: Yes, Your Honor.

THE COURT: Okay.

As Plaintiffs note, this stipulation is sufficient to form a reasonable basis for the trial court to assign fault on the basis of custodial liability. The Louisiana Supreme Court long ago in *Kent v. Gulf States Utilities Co.*, 418 So.2d 493, 497 (La.1982), stated:

> In a typical negligence case against the owner of a thing (such as a tree) which is actively involved in the causation of injury, the claimant must prove that something about the thing created an unreasonable risk of injury that resulted in the damage, *that the owner knew or should have known of that risk*, and that the owner nevertheless failed to render the thing safe or to take adequate steps to prevent the damage caused by the thing.

The facts established the tire in question was approximately six to seven years old and had been retreaded three separate times. It was also plugged twice and patched twice. It was undisputed that AAA Cooper was aware of the tire's history. Despite this AAA Cooper made the choice to continue to use the tire rather than replace it with a new one. Mr. Huguley testified in his deposition he preferred new tires to retread tires because retread tires fail more often. However, Mr. Huguley noted that decision of which tires were placed on the tractor-trailer was made by AAA Cooper and not him.

Defendants insist there was no proof that the failed, retreaded tire was a cause of the accident. This assertion is made despite the clear, unequivocal testimony of several witnesses that the Mouton vehicle sharply veered off the interstate right as tire debris began flying from the AAA Cooper tractor-trailer. The jury clearly found the defective tire was a cause of the accident and held AAA Cooper at fault for knowingly placing a defective tire on its tractor-trailer. We find no manifest error in this finding.

14

## II.    *Plaintiffs' Pleadings.*

Defendants argue in several related assignments of error that Plaintiffs did not plead a cause of action upon which relief could be granted against AAA Cooper under La.Civ.Code arts. 2317 and 2317.1.

As Plaintiffs point out, Defendants did not object to the inclusion of a fault blank for AAA Cooper, and therefore, that cause of action should not have been argued to the jury or included in the jury instructions. Louisiana Code of Civil Procedure Article 1793(C) addresses such an instance and provides:

> A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection. If he objects prior to the time the jury retires, he shall be given an opportunity to make the objection out of the hearing of the jury.

Pursuant to that article, this court has repeatedly held that a party waives its right to object to jury instructions on appeal if it does not object to the charges at trial. *See Libersat v. J & K Trucking, Inc.*, 00-192 (La.App. 3 Cir. 10/11/00), 772 So.2d 173, *writ denied*, 01-458 (La. 4/12/01), 789 So.2d 598; *Lee v. Auto. Cas. Ins. Co.*, 96-517 (La.App. 3 Cir. 11/6/96), 682 So.2d 995, *writ denied*, 96-2949 (La. 1/31/97), 687 So.2d 409; *Stroud v. Liberty Mut. Ins. Co.*, 429 So.2d 492 (La.App. 3 Cir.), *writ denied*, 437 So.2d 1147 (La.1983). Accordingly, Defendants have waived that argument.

Further, a review of Plaintiffs' petition shows it alleges that Defendants failed to maintain the tractor-trailer "in a proper fashion and for its intended use." It was also asserted Defendants "fail[ed] to promulgate and adhere to reasonable safety standards" and "fail[ed] to act as a prudent owner/operator/employer of commercial vehicles." Clearly these allegations in the petition set forth the defect theory of the failed tire.

AAA Cooper also argues in brief the jury assessed it with ninety percent (90 %) fault solely on the basis of custodial liability. Such a conclusion is based only on speculation, as we cannot divine the reasoning the jury used in reaching its fault assessments. As Plaintiffs point out, it is certainly reasonable that AAA Cooper was found at fault for using a defective tire that had been repaired on seven separate occasions independent of custodial liability.

Plaintiffs also note the jury was not informed that fault on the verdict form could have been jointly rendered *in solido* against AAA Cooper and Mr. Huguley. AAA Cooper stipulated at trial that Mr. Huguley was in the course and scope of his employment with it at the time of the accident. Therefore, AAA Cooper would be responsible for the entire judgment amount as a result of vicarious liability regardless of the allocation of fault between itself and Mr. Huguley. As we have found no manifest error in the jury's determination that Mr. Mouton was not at fault in causing the accident, any error in the apportionment of fault between AAA Cooper and Mr. Huguley would be harmless.

## III.    *Assignments of Error Related to Plaintiffs' Expert.*

### *a. Qualification of Michael Gillen as an Expert.*

Defendants next contend the trial court erred in allowing Plaintiffs' expert Michael Gillen to testify as an expert in accident reconstruction. It was established Mr. Gillen began investigating accidents in 1977 when he joined the Baton Rouge City Police Department. By his estimate, Mr. Gillen, during his nearly twenty years as a police officer, investigated over two thousand accidents. In 1996, he began National Collisions Technologies, Incorporated (NCTI), a company that investigates accidents. He estimated he had worked as an accident reconstructionist on approximately one thousand five hundred cases since starting NCTI.

Mr. Gillen stated he had training from numerous universities, the Louisiana Highway Safety Commission and the Federal Highway Administration. He also has taught numerous continuing education courses in accident investigation and reconstruction. Mr. Gillen noted the Federal Highway Administration has a minimum standard guideline of three hundred hours for formal tested courses in accident reconstruction, and he had completed about one thousand three hundred hours of courses in accident investigation and reconstruction. These included courses specific to commercial vehicles.

Mr. Gillen noted he has been qualified as an expert in accident reconstruction in city, state and federal courts in Louisiana and Mississippi. The trial court, after noting Mr. Gillen previously appeared as an expert in its court, accepted him as an expert in this case.

Interestingly, Defendants cite *Cheairs v. State ex rel. DOTD*, 03-680 (La. 12/3/03), 861 So.2d 536, in their discussion of the applicable law on qualifying experts. As Plaintiffs note, in *Cheairs* the Louisiana Supreme Court addressed the issue of whether the expert in that case was properly qualified to testify. That expert, as in this case, was Michael Gillen. The court concluded, specific to Mr. Gillen's qualifications as an expert:

> In this case, plaintiff offered the expert testimony of Michael S. Gillen, a retired 20-year veteran of the Baton Rouge City Police Department, who had been employed since 1993 by a private corporation, National Collision Technologies, as a traffic reconstructionist. . . .
>
> [T]he district court properly found that Gillen was qualified to testify concerning the standards set forth by the MUTCD and properly admitted the expert testimony of Gillen, who is qualified by experience, skill, and training, to state his opinion[.]

*Id.* at 540, 544-45.

"In reviewing the decision of a trial court in qualifying a witness as an expert, courts typically place the burden on the party offering the witness as an

expert and consider that the decision to accept or reject the offer rests within the sound discretion of the trial court." *State v. Craig*, 95-2499, pp. 8-9 (La. 5/20/97), 699 So.2d 865, 870, *cert. denied*, 522 U.S. 935, 118 S.Ct. 343 (1997). Therefore, a trial court's decision to qualify an expert witness will not be overturned absent an abuse of discretion. *State v. Castleberry*, 98-1388 (La. 4/13/99), 758 So.2d 749. We find no abuse of discretion by the trial court in allowing Mr. Gillen to testify as an expert in this case.

Defendants specifically argued the trial court erred in allowing Mr. Gillen to "testify as an expert in the 'rules of the road' governing commercial truck drivers." We find no merit in this contention, as Mr. Gillen simply read from the requirements of the Commercial Drivers' License Manual, which was admitted into evidence. Mr. Huguley acknowledged he was familiar with that manual and agreed they were the "rules of the road for a truck driver."

*b. Costs Taxed for Mr. Gillen's Expert Testimony*.

Defendants also argue the expert costs taxed to them for Mr. Gillen's testimony were not reasonable. Plaintiffs were awarded $8,575.00 for Mr. Gillen's services and testimony in conjunction with the case. Mr. Gillen claimed $2,449.00 in costs associated with his trial attendance, travel and mileage. He also charged $6,126.00 for his investigation of the accident and his preparation for trial. Plaintiffs submitted the invoices from NCTI in their motion to tax costs. The trial court stated as follows regarding the amount claimed:

> . . . with the $8,575, I've seen Mr. Gillen's work. He's a well qualified expert. He came in and I know what his preparation time and his travel time and his testimony time. I find $8,575 to be reasonable for an expert with his knowledge and his trial preparation.

Defendants also infer it was inappropriate for employees of NCTI to recheck diagrams and computations made by Mr. Gillen. However, as Plaintiffs note, they retained NCTI, of which Mr. Gillen is the owner and corporate representative, to

investigate and reconstruct the accident. Thus, we find nothing improper or unreasonable with the involvement of NCTI's associates in the preparation of Plaintiffs' case.

The trial court has great discretion in fixing fees for expert witnesses and determining the reasonableness of costs incurred by the prevailing party. *Otwell v. Diversified Timber Services, Inc.*, 04-924 (La.App. 3 Cir. 1/26/05) 896 So.2d 222, *writ denied*, 05-467 (La.4/22/05), 899 So.2d 575. In this case, we do not find an abuse of discretion by the trial court.

## IV. *Trial Court's Granting of the JNOV.*

Defendants contend the trial court erred in granting the JNOV and increasing the award of general damages in the survival action from $50,000.00 to $150,000.00.

Louisiana Code of Civil Procedure Article 1811 governs the use of JNOV. As outlined by the supreme court in *Scott v. Hospital Service District No. 1*, 496 So.2d 270, 274 (La.1986), a JNOV is warranted when "the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict[.]" The motion should be granted "when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover." *Id.* (quoting *Robertson v. Penn*, 472 So.2d 927, 929 (La.App. 1 Cir.), *writ denied*, 476 So.2d 353 (La.1985)).

In *Anderson v. New Orleans Public Service, Inc.*, 583 So.2d 829, 832 (La.1991), the Louisiana Supreme Court discussed appellate review of a JNOV:

> In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that

19

reasonable men could not arrive at a contrary verdict?   If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion.   If, however, reasonable men in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated.

In the instant case, Defendants argue that the trial court erred in granting Plaintiffs' motion for JNOV, which thereby raised the total general damage award in Mr. Mouton's survival action from $50,000.00 to $150,000.00.   We disagree. In granting the JNOV motion, the lower court signaled its view that the facts and inferences of the case at bar point so strongly and overwhelmingly in favor of increasing the general damages awarded to Mr. Mouton that reasonable persons in the exercise of impartial judgment could arrive at no other conclusion.   Such a view finds support in the record evidence.

Survival damages may be appropriately awarded for the pre-death mental and physical pain and suffering of the deceased. *Temple v. Liberty Mut. Ins. Co.*, 330 So.2d 891 (La.1976).   "In determining survival damages, the court should consider the severity and duration of any pain or any pre-impact fear experienced by the deceased, and any other damages sustained by the deceased up to the moment of death." *Leary v. State Farm Mut. Auto. Ins. Co.*, 07-1184, p. 4 (La.App. 3 Cir. 3/5/08), 978 So.2d 1094, 1098, *writ denied*, 08-727 (La.5/30/08).

Mr. Mouton's death certificate reads that he died of "positional asphyxiation" and "multiple traumatic injuries."   The Acadian Ambulance Report stated that Mr. Mouton's body was "mottled and purple."   Despite this brutal cause of death, it was established that Mr. Mouton survived the crash for some period of time.

At trial, Todd Dauphinet testified as follows concerning what he saw and heard when he approached Mr. Mouton's truck after the crash:

Q. When you got to the truck, what did you do?

20

A. I ran down from my vehicle down to the embankment to the truck. I got inside partially to see if I could see anybody and at that time I couldn't see anybody. I just saw some hair laying on the top of the truck which was upside –

Q. – The truck was upside down, right side up?

A. Yes. Upside down. So, I just asked if everybody was alright and I could hear a moan inside the truck. And after I say, "Can I help? Or do you need help?" and they said like "Help me" it sounded like. But it was a moan.

Q. It was saying, "Help me?"

A. It sounded that way. It was like a vague moan with just a little voice, like.

Q. Were you the first one as far as you know to get to the truck?

A. Yes.

Q. Describe the inside of the truck from what you saw.

A. It was pretty much smashed to the top.

Mr. Dauphinet originally thought Mr. Mouton was a woman because of the high-pitched voice he heard and the fact the body was so mangled he could not tell whether it was a man or woman.

Brock Begnaud, who arrived at the scene with the Lafayette Fire Department, stated he did get a "vocal response" from Mr. Mouton, although he described the response as "garbled, illegible." He testified the total extraction time to remove Mr. Mouton from the vehicle was ninety-eight minutes. At some point during the extraction, he stated Mr. Mouton became unresponsive. At that point, which Mr. Begnaud guessed was "fifteen or twenty minutes" after he arrived at the accident scene, Acadian Ambulance personnel were called in to check Mr. Mouton's vital signs. When it was determined he showed no signs of life, Mr. Mouton was pronounced deceased. As it took the fire department ten to fifteen minutes to arrive at the scene after receiving the call, it is clear Mr. Mouton survived the accident impact for approximately twenty-five to thirty-five minutes.

21

After leaving the interstate, Mr. Mouton's truck went through the guardrail, struck a concrete retaining wall, impacted a tree and flipped upside down. The cab of the vehicle was crushed and the hood ripped off. Mr. Mouton's body was badly mangled, and he suffered multiple traumatic injuries. He hung upside down in his cab, undoubtedly in excruciating pain for approximately thirty minutes, until he eventually choked to death. All this while enduring the painful realization that his life was ending.

Examining the record before us, we cannot say the trial court erred in finding the facts and inferences pointed so strongly and overwhelmingly in favor of the Plaintiffs that the motion for JNOV was properly granted. We also find no merit to Defendants' contention that the amount of damages awarded by the trial court was abusively high.

## V. *Plaintiffs' Answer to the Appeal*.

Plaintiffs answered the appeal and requested this court modify the awards for general damages to Cory Mouton and Linda Mouton. They assert these damage awards were an abuse of the jury's discretion and were abusively low.

In considering whether an award of general damages is excessive or inadequate, we are guided by the decision in *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1261 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994), wherein our supreme court noted that "the discretion vested in the trier of fact is 'great,' and even vast, so that an appellate court should rarely disturb an award of general damages." Under *Youn*, "[t]he initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the 'much discretion' of the trier of fact." *Id*. at 1260. Only after the initial inquiry is answered in the affirmative should the appellate court increase or reduce the award. *Id*. In making the initial inquiry, the reviewing court should not use "a scale of prior awards in cases with

22

generically similar medical injuries to determine whether the particular trier of fact abused its discretion in the awards to the particular plaintiff under the facts and circumstances peculiar to the particular case." *Id.* at 1260. Such prior awards should be considered only after the reviewing court concludes that there has been an abuse of discretion. *Id.*

The jury awarded wrongful death general damages of $300,000.00 to Linda Mouton and $150,000.00 to Cory Mouton. Plaintiffs contest these awards on appeal but did not include in brief what it considered an appropriate award nor any cited cases which would indicate the jury's awards were inadequate and an abuse of discretion. It is well settled that "[g]eneral damages are those which are inherently speculative in nature and cannot be fixed with mathematical certainty." *Miller v. LAMMICO*, 07-1352, p. 27 (La. 1/16/08), 973 So.2d 693, 711. We have thoroughly considered the particular facts and circumstances of the losses suffered by Plaintiffs in this matter and cannot say the jury abused its great discretion in making its damage awards.

## DECREE

For the foregoing reasons, the judgment of the lower court is affirmed in all respects. All costs of this appeal are assessed to Defendants-Appellants.

**AFFIRMED.**